Howard ROSS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17877.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 9, 1963.

Decided June 30, 1965.

---

Danaher, Circuit Judge, dissented.

Mr. Edwin R. Schneider, Jr., Washington, D. C. (appointed by this court), for appellant.

Mr. Gerald A. Messerman, Asst. U. S. Atty., at the time of argument, with whom Messrs. David C. Acheson, U. S. Atty., Frank Q. Nebeker, and Harold J. Sullivan, Asst. U. S. Attys., were on the brief, for appellee. Mr. Jerome Nelson, Asst. U. S. Atty., also entered an appearance for appellee.

Before WASHINGTON, DANAHER, and McGOWAN, Circuit Judges.

PER CURIAM.

When this appeal was first before us, it appeared that appellant had been convicted of a narcotics violation solely upon the testimony of an undercover policeman. No corroboration was forthcoming other than the drugs asserted to have been purchased from appellant by the policeman on May 10, 1962. Because the complaint against appellant was not sworn out until December 5, 1962—seven months after the alleged offense—we remanded the case for supplementation of the record with respect to the reasonableness of this delay in apprising appellant of the charge against him, and the effect of that delay on appellant's ability to defend against the charge. A hearing was held on remand; findings of fact were made; and conclusions of law were drawn to the effect that the delay was not unreasonable because it was "necessitated by the requirements of effective law-enforcement." The court also concluded that, even if the delay be thought unreasonable, there was no showing of prejudice to appellant by reason thereof.

Upon the record as supplemented, appellant renewed his contentions that the deliberate and purposeful delay between offense and complaint violated rights guaranteed by the Fifth and Sixth Amendments. We put the latter to one side because we think a record of this kind more accurately may be taken as presenting a question akin to a Fifth Amendment due process issue, centering around appellant's ability to defend himself. As recently as two years ago, a majority opinion of this court disclaimed any purpose to suggest that "delay between offense and prosecution could not be so oppressive as to constitute a denial of due process; " and it went on to say: "Although it has not been directly decided, due process may be denied when a formal charge is delayed for an unreasonably oppressive and unjustifiable time after the offense to the prejudice of the accused * * *." Nickens v. United States, 116 U.S.App.D.C. 338, 340 n. 2, 323 F.2d 808, 810 n.2 (1963). The concurring opinion in that case embraced even more unreservedly this concept that the statute of limitations is not the sole standard by which delay between offense and complaint is to be measured. See also Wilson v. United States, 118 U.S.

App.D.C. 319, 335 F.2d 982, 984–986 (1964) (dissenting opinion from denial of rehearing en banc); cf. Taylor v. United States, 99 U.S.App.D.C. 183, 238 F.2d 259 (1956); Petition of Provoo, 17 F.R.D. 183 (D.Md.), aff'd, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955).

There was no significant delay in arresting appellant once he had been charged or in reaching his trial upon that charge. What we have, thus, is a case where, although it is concluded that appellant was continuously available for arrest, seven months elapsed between the time of the alleged sale of narcotics and the swearing out of the complaint; and where, apart from the narcotics, the Government's case consisted solely of a policeman's testimony that he had purchased narcotics from appellant. The issue involved is given concreteness by the fact that this witness had no personal recollection of the incident, but testified largely from a recollection refreshed just before trial by reference to his contemporaneous entries in a notebook. Appellant had no notebook; and, although he denied making the sale, he was unable to account for himself in respect of the time and place in question because of an asserted lack of recollection and of means for the reconstruction of the day involved.

Although we have no reason to reject such facts as were found by the District Court, we do not think that its conclusions of law are compelled by them. Speaking only to what this record discloses, we think there was an undue subordination of appellant's interests which should not, at least in a record as barren of reassuring corroboration as this one, result in a sustainable conviction. Accordingly, we reverse.

## I

There is, of course, a substantial public interest in effective police work to detect violations of the narcotics laws. To this end the Metropolitan Police have employed their own members as undercover agents to make purchases of narcotics. It is elemental that the effectiveness of such an agent does not survive the time when it becomes known that he is a policeman. That time is ordinarily the moment when he appears before a magistrate to swear out complaints against those from whom he has made purchases. Thus, it is the practice for such an agent to postpone all swearing out of complaints until he has completed his underground service. At that point, and armed with his notebook of notations, he swears out all the complaints at once.

Officer Bush, the policeman involved in this case, first joined the force on March 5, 1962. His undercover work began very shortly therafter on March 18. It terminated on December 5, 1962, at which time Bush swore out complaints against 51 persons, including appellant, from whom he asserted that he had purchased narcotics at one time or another during the preceding seven months. During the seven months, Bush made a total of 125 purchases, an appreciable number of which were so-called "burns" or "dupes," i. e., the articles represented to be narcotics were not so in fact. During the last three months of his undercover service, there were 66 transactions in all, 15 of which were with persons from whom he had already made purchases prior to September 5, and 23 of which were second or third purchases from persons first dealt with after September 5. There is some conflict in the record as to exactly how many new contacts there were in the last three months, but it is clear that a substantial part of Bush's work during this period duplicated his earlier contacts.[1]

The record suggests that the principal limitation on the number of men assigned to undercover work is budgetary. With more funds for more personnel, more undercover agents could be used and

1. Detective Paul, one of the two men who decided when to end undercover investigations, appeared to concede in his testimony that the later phase of Officer Bush's service was characterized by a significant amount of duplication, and that this was an important element in the decision to terminate his undercover work.

qualified persons would be available. The Captain of the Narcotics Squad decides when an undercover investigation is to end, but he acts to do so only when the matter is brought to his attention by two particular detectives serving on the Narcotics Squad. These latter have never received any instructions from higher authority as to the criteria to be applied in weighing whether to terminate an undercover assignment. A number of factors were identified which they have thought to be relevant, but none of these in any way takes account of the interest of an accused in knowing as soon as possible of the charge against him in order that he may prepare most effectively to rebut it.

We do not conclude from all this that the delay in moving against appellant was, in the trial court's words, "necessitated by the requirements of effective law-enforcement." It seems to us, contrarily, that the latter part of Bush's service was marked by declining effectiveness, at least of such proportions as to fail to balance the scale against appellant's accelerating need to know that, unless Officer Bush mislaid his notebook, he was ultimately going to be charged with having committed a crime at a certain time and place on May 10. It is always to be remembered that the withholding of this information is a conscious act on the part of the police. That alone does not condemn it, because the Department is motivated solely by a purpose to enhance its effectiveness in the public interest. But the Constitution contemplates a separate interest in fair procedures for the citizen faced with the loss of his liberty by reason of criminal charges. When interests of this nature impinge upon each other, as they have a way of doing, they must be accommodated. A balance must be struck, if one or the other is not to be sacrificed completely.. We see no inevitable necessity for such a sacrifice here. Certainly there need be none if the Police Department in pursuing the one interest is not wholly oblivious of the other. Of course the Department must have some considerable latitude for the planning and organization of its undercover program, but this record suggests strongly that that latitude, if it were informed by any awareness whatsoever of the due process interest, could and would result in a program reasonably adequate to the demands made upon it by differing aspects of the public interest.[2]

It may be urged that, the human memory being what it is, the difference between, say, four months and seven months would be of little consequence to appellant. But no one can say this for certain; and, in any event, mutual dissatisfaction is a well-nigh inevitable phenomenon of balancing. What we can say is that, where there appear to be other means for achieving the desired result, there is no justification for overlooking this fact on the speculation that appellant's mnemonic capacities might not have been enlarged by earlier notice. The building of a framework of procedural fair play, like other constructions, rests to some degree upon probabilities. And the probabilities here are in favor of the shorter period.

## II

Appellant is a man of limited education who is so circumstanced that there would appear to be very little to differentiate one day from another, especially as they begin to recede into the past. He kept no diary or other record, received little mail, and, at the time in question, had no regular employment. He testified, both at trial and on remand, that he could not remember, or, even after in-

---

2. Counsel for appellant points out that at least 40 of the 51 persons charged by Officer Bush made sales to him during the last three months. If these sales alone had been used as the basis of complaints, the delay in no case would have exceeded three months; and counsel volunteers the opinion that a delay of this order must surely be taken to be "in accord with a fair policy in the administration of criminal justice." Whatever the outer limits of such a period may be, the point is that, being purposeful, the delay should result only from arrangements which reflect a conscious effort to accommodate fairness and efficiency.

tensive discussions with his attorney, reconstruct, the events of May 10, 1962. His personal recollections of that day resembled those of Officer Bush. It was in the ability to reconstruct that the latter, armed with his notebook, was superior.

The trial court, however, concluded that appellant was not prejudiced by the delay. This conclusion seems to rest mainly on its findings that appellant was likewise unable to remember what he had been doing during a particular ten-minute period two weeks prior to the hearing, and that a witness called by appellant did not suffer from impaired memory. On cross-examination, appellant was asked by the prosecutor where he had been on April 22, 1964, to which appellant replied that he must have been in jail. But he was unable to recall immediately what he had been doing during a particular ten-minute period on that day. Such a failure of recall, in the face of a prosecutor's sudden and unexpected inquiry, would hardly be surprising in the most alert of witnesses. Moreover, as appellant's counsel quickly pointed out, the event was recent enough and appellant remembered enough to have permitted him, with time and some assistance, to reconstruct his activities on April 22, 1964. The opportunity to do the same in respect of the events of May 10, 1962, however, was effectively denied appellant by the Government's decision to postpone prosecution.

At the supplemental hearing on remand, appellant's only witness other than himself was Ethel Howard. She testified that she was living with appellant at the time the offense was supposed to have been committed, and that he was with her every night, caring for her while she was pregnant and suffering from "chills and fever." She admitted on direct examination that appellant had occasionally left the house during that period, but she could not remember whether he had gone out around midnight on May 9. In response to an inquiry by the prosecutor, however, she denied that he had ever left the house, even for short periods, during that week, although the transcript strongly suggests that she may have misunderstood the question.[3] More significant, in our view, is the fact that this seemingly exculpating testimony was never offered at appellant's trial. Ethel Howard was scheduled to testify at that time on appellant's behalf, but she ultimately decided not to appear because, in her words, "I didn't think I could remember."

We do not believe, therefore, that the record supports the trial court's conclusion that "there is no showing that witnesses' memories were impaired by the delay." Officer Bush admitted that he would not have been able to testify to the events of May 10, 1962, without referring to his records. Appellant on two occasions represented that he could no longer remember where he was or what he was doing at the time the offense was alleged to

3. Q [Assistant U. S. Attorney] * * * And you say that Howard Ross was in and out of the house several times while you were living with him; wasn't he?
    A [Ethel Howard] Yes, sir.
    Q And there was nights when he would be gone for substantial periods of time, weren't there?
    A No, sir.
    Q There weren't nights when he would be gone for substantial periods of time?
    A No, sir.
    Q Were there nights when he was gone for short periods of time?
    A I don't quite understand you.
    Q Were there nights when he was gone for short periods of time?
    A No, sir.

Q You mean he was with you all the time at night?
    A Yes, sir.
    Q And you are sure about that?
    A Yes, I am.
        * * * * *
    Mr. Bellow [Appellant's counsel]. Your Honor, during the recess I was informed by the last witness, Mrs. Ethel Howard, that she did not understand the Prosecutor's questions to her during the course of the cross-examination. And I respectfully ask permission to recall her so that I can—
    The Court. You talked with her?
    Mr. Bellow. Yes, I did.
    The Court. You may not recall her.

have been committed. And Ethel Howard, who had been living with appellant at the time, was so doubtful of her ability to recall that she decided to forego the opportunity to testify on his behalf at the trial itself.

The trial court further concluded that there was no "indication that the defendant would have been able to present a more adequate defense if he had been arrested sooner than he was." But it was the very nature of appellant's disability that tended to make such a showing impossible. His failure of memory and his inability to reconstruct what he did not remember virtually precluded his showing in what respects his defense might have been more successful if the delay had been shorter. With time passed any opportunity appellant might have had to reconstruct the events of May 10 or to discover how he was disadvantaged thereby. In a very real sense, the extent to which he was prejudiced by the Government's delay is evidenced by the difficulty he encountered in establishing with particularity the elements of that prejudice.

### III

The dissent urges in the first instance that the court's action is contrary to federal decisional authority, in this circuit as elsewhere, assertedly to the effect that the reasonableness of a delay between offense and complaint is, in the words of our colleague, "controlled *exclusively* by the applicable statute of limitations." If this is so,[4] then it is hard to understand what purpose was served by our unanimous order of remand for inquiry into the reasonableness of the delay in this case, there being no question but that the prosecution here was initi-

ated within the statutorily limited period. It is quite understandable that our earlier unanimity with respect to the making of the remand could dissolve in differing appraisals of its results, but we appear now to be told that the remand itself was in the face of governing law.

It seems fair to say that our solidarity as to the remand in this case, and the fact of identical remands in other pending appeals, reflected a growing apprehension upon the part of many members of this court as successive cases have come to establish the pattern and effect of the undercover narcotics operations of the Metropolitan Police. The recurring spectacle of convictions based solely upon the testimony of a police witness who, by reason of lapse of time, could not testify on the basis of unaided personal recollection, began to implant doubts as to the propriety of permitting the reasonableness of the delay, in this very narrow and specialized class of narcotics cases, to be "controlled *exclusively* by the applicable statute of limitations." We have the greatest respect for the doubts expressed in the dissent as to the disposition now made of the District Court's findings and conclusions upon remand. Similar respect is presumably due the doubts which prompted the remand in the first place.

The record before us is, thus, one which shows (1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim of inability to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook. We are not convinced that successful police operations against nar-

---

4. Our doubts that it is have been indicated hereinabove. The dissent cites *Redfield v. United States*, 117 U.S.App.D.C. 231, 328 F.2d 532, cert. denied 377 U.S. 972, 84 S.Ct. 1654, 12 L.Ed.2d 741 (1964), and *Hardy v. United States*, 119 U.S.App. D.C. 364, 343 F.2d 233 (1964), both decided since *Nickens*, in support of its representation. We note only that in *Redfield* the defendant's sentence could clearly have been supported by an offense

charged to have occurred within three months prior to his arrest. Indeed, the indictment charged and the defendant was convicted of an offense committed on the day of arrest and two days after the swearing out of the complaint. *Hardy* did not involve the wholly uncorroborated testimony of an undercover policeman; a paid police informer, who claimed to have been an eyewitness to the sale, testified in support of the Government.

cotics in this jurisdiction depend upon proceedings of such slender dimensions. The Government's case should, at the least, have more substance than the one before us if it is to override the appellant's interest in earlier notification. Without attempting to define the precise reach of the Fifth Amendment in this context, a due regard for our supervisory responsibility for criminal proceedings in this jurisdiction requires, in our view, the reversal of this conviction.

It is so ordered.

DANAHER, Circuit Judge (dissenting).

I dissent from the position announced by my colleagues. If I correctly penetrate their circumlocution, they erroneously in my view undertake (1) to weigh the evidence and (2) to supervise the police in their conduct of an investigation. This case assumes unusual proportions because at least a dozen other convictions are already backed up awaiting a decision here. My colleagues would substitute their determination as to what should be done for that of at least 144 jurors who had heard the evidence in the cases mentioned and who had found to their satisfaction, that the Government had proved guilt beyond a reasonable doubt.

In terms of the first point, my colleagues sense a lack of "reassuring corroboration," they say. Only about a year ago we decided Wilson v. United States.[1] There we said:

"We have heretofore held on several occasions that the uncorroborated testimony of a narcotics agent is sufficient to support conviction for violation of the narcotics laws." [2]

We denied rehearing en banc, although three judges would have granted the petition. The latter thought that where arrest had been delayed for six months following the date of the alleged offense, the memory of the narcotics agent might be blurred. Moreover, the accused might have been able to show that she was elsewhere at the time of the offense. Of course, she could have made no such showing, if in fact she had sold narcotics to the officer at the time, date and place as testified by him. So, here, Ross testified that he had never sold narcotics to Bush. He added that he had never even seen Bush until he met him at the hearing before the Commissioner. I will mention other details on this score in due course, but I observe immediately that the majority position is directly contrary to the established law in this circuit. My colleagues say that a delay of seven months is too long, but that a delay of four months might be all right.

The position of my colleagues with respect to the manner in which police conduct their investigations seems to rest on the majority's view that the police procedures are not "fair." The federal courts, without exception as far as I can see, have held that a delay which occurs between the commission of an offense and the commencement of prosecution is controlled *exclusively* by the applicable statute of limitations.[3] The matter of "delay" had been considered in Redfield v. United States [4] where sales had been made to an undercover police officer. Seeking certiorari, the petitioner Redfield in his supporting memorandum had decried the "familiar pattern" of the undercover police officer who maintains his undisclosed status for many months "as long as he can be useful to the police in this manner." He advanced arguments such as the majority here accepts. Specifically he sought the aid of the Supreme Court in ascertaining what delay might be an "unreasonably oppressive and unjustifiable time." The Supreme

1. 118 U.S.App.D.C. 319, 335 F.2d 982 (1963).

2. *Id.* at 320, 335 F.2d at 983.

3. See, e.g., Harlow v. United States, 301 F.2d 361, 366 (5 Cir.), cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962); and see Nickens v. United States, 116 U.S.App.D.C. 338, 339, 323 F.2d 808, 809 (1963).

4. 117 U.S.App.D.C. 231, 328 F.2d 532 (1964).

Court denied the writ.[5] The Government's opposition had relied solely upon our opinion in Nickens v. United States, *supra* note 3.

After Redfield, in Hardy v. United States,[6] we again considered a delay in arrest for eight months after the alleged offense. That case involved a transaction with a paid informant rather than a police officer. There Judge Washington would have imported an additional "corroboration" requirement. Again we denied a petition for rehearing *en banc*, although two of our judges would have granted the petition.

It seems to me that the law is clear, and is definitely contrary to the position the majority now asserts. I have no doubt that many judges like many lawyers, in their approach to these narcotics cases, are moved consciously or not by the heavy penalties which follow convictions for narcotics violations. But policy considerations in such matters are for Congress, not for the courts. Mr. Justice Frankfurter said as much in Gore v. United States.[7] He had pointed out that the penalties prescribed by Congress reveal a legislative determination "to turn the screw of the criminal machinery—detention, prosecution, and punishment—tighter and tighter." [8] Other judges seem to think that a narcotics violator, if an addict, may be entitled to acquittal by reason of insanity.[9]

So, without the citation of a single authority contrary to our well-established law, my colleagues renew the assault upon the pre-arrest delay. They would have us in terms of an undefined standard of "fairness" make an ad hoc determination despite an error-free trial. A pre-trial motion to dismiss had been overruled and on that account, we had remanded for a hearing respecting the "reasonableness vel non" of the delay between offense and arrest and the effect of that delay upon the defense. An extensive hearing was held by the trial judge and the supplemental record is now before us. The majority say, as indeed they must, "[W]e have no reason to reject such facts as were found by the District Court."

The trial judge had heard all of the evidence, both at trial and after remand. He could see that the police in establishing their cases against "pushers" like Ross were attempting to lay the foundation for locating their source of supply. The Officer Bush, "on the street" as he was, was bound to pursue a course of observation of the pattern of conduct of suspects; his investigation would have gauged the ease or difficulty in arranging a narcotics purchase, proximity to the possible source and information as to others with whom a "pusher" might be dealing. All that kind of thing was bound up in his finding that the investigation had been

"conducted in an efficient and effective fashion. As a result of the investigation, warrants were obtained for 51 persons whose unlawful activities were discovered by Private Bush in the course of his work. At the time of the hearing indictments had been obtained against 34 of those persons. Because of the clandestine nature of the business engaged in by the persons investigated, the use of an undercover agent to uncover that business was a practical necessity."

About 12:25 A.M. on May 10, 1962, Officer Bush was seated in the New Re-

5.  377 U.S. 972, 84 S.Ct. 1654, 12 L.Ed.2d 741 (1964).

6.  119 U.S.App.D.C. 364, 343 F.2d 233 (1964), cert. denied, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276 (1965).

7.  357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed. 2d 1405 (1958).

8.  *Id.* at 390, 78 S.Ct. at 1283.

9.  Brown v. United States, 118 U.S.App. D.C. 76, 331 F.2d 822 (1964), cited in Castle v. United States, —— U.S.App.D.C. ——, 347 F.2d 492 n. 1 (Nov. 19, 1964), cert. denied, 85 S.Ct. 1568, 1811 (1965), but see discussion by Judge Burger, ——; Heard v. United States, —— U.S.App.D.C. ——, 348 F.2d 43 (Dec. 17, 1964), petition for rehearing *en banc* denied May 12, 1965, majority opinion modified May 14, 1965.

public restaurant on Seventh Street. Uninvited, Ross came to the booth and sat down and conversation followed. "How was that pill of Note's?", Bush asked. "Note," as Bush knew, was a dealer who was believed to be operating in the neighborhood. Ross assured the officer as to the satisfactory quality of "Note's" merchandise and asked Bush if he wanted to buy some. An order for three capsules was placed. Ross got up and left the restaurant, the officer followed him presently, and in 4 or 5 minutes Ross returned with three capsules of heroin, collected $4.50 from Bush, and the officer placed the capsules in an envelope, marked the envelope with the date and place and later that same day turned the contraband over to his superior, Detective Paul.

Thus, Officer Bush could qualify as a "reliable" source.[10] On May 18, 1962, officers of the Narcotics Squad—not including Bush—armed with a search warrant, raided the home of "Note," located only about two minutes walk from the New Republic restaurant. There they seized a quantity of narcotics. It developed that Ross lived in the same premises with "Note," indeed he was outside the house at the time of the raid, he testified. The dealer, "Note" as it developed, was none other than James Castle whose conviction we affirmed [11] on November 19, 1964. My colleagues assume that Ross suffered from a loss of memory as to the events of May 10th. He testified flatly, however, that he never sold any narcotics whatever to Bush. He testified fully with respect to the raid of May 18, even to full details as to his discussion with Officers Didone and Paul. He charged that the police were angry with him because he stated he intended to testify in behalf of Castle.

How many other narcotics cases involving the more important dealers have been developed as a result of the investigation by Officer Bush, we can not know from this record. That the efforts of Officer Bush were highly successful is

clearly established, just as the trial judge found. I am unwilling to join my colleagues in striking down the Ross prosecution, even though narcotics violations are involved. The record here shows that he was in jail for some part of 1962, at least, on some other narcotics charge. I am unwilling to say as a matter of law that conviction of Ross for the May 10th violation was essentially unfair.

Perhaps greater importance should be accorded to the present issue, since experience has shown, a delayed arrest may be deemed essential in yet other areas of law enforcement. The passing of counterfeit money by one of many confederates is a ready instance of where the utterance of a single counterfeit note may seem of far less significance at the time than that the plates be located and the actual printers of the illicit currency be apprehended. Another example occurs in cases of use of the mails in furtherance of a scheme to defraud. In United States v. Graham, 102 F.2d 436, 440 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939), an immediate arrest might have frustrated the entire enforcement effort. Other instances will come to mind where continued surveillance may be essential to proper law enforcement. How far and in what circumstances the rule announced by my colleagues might have impact in such situations, we can not know.

To return to Ross, the fact of a single prosecution does not negate his predisposition to engage in the nefarious enterprise. How many other sales he may have made to others on the night of May 10th, we do not know. That he was a "pusher" for the dealer "Note" is clear. Castle, alias "Note," obviously is one of the dealer type so importantly the target of police investigation in narcotics cases. Repeatedly we have been made aware from records before us of just how anxiously those accused of narcotics violation seek to ascertain the identity of

10. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

11. *Supra* note 9.

an undercover police officer. Whether or not there existed in this case a necessity to protect Officer Bush was involved in our order of remand. I believe to be correct the conclusion of the trial judge that the delay under attack here was not unreasonable. He established the basis for his ultimate determination by findings which I now quote:

"(4) Application for arrest warrants and commencement of prosecution against the individuals whose unlawful activities were detected by Private Bush required disclosure of the officer's true identity. At such time as that disclosure might occur, termination of the investigation would be mandatory. Bush could not work in an undercover capacity after his identity was revealed. In order to allow the investigation to continue, warrants were not obtained for the individuals involved until the investigation was closed.

"(5) The decision to terminate the investigation was made by Private Bush's supervisors and the head officer of the Narcotics Squad. Three factors were considered in determining that the investigation should be closed: 1) The time which had already been consumed by the investigation; 2) the growing danger to Private Bush arising from the increased possibility that his identity might be learned by the people he was investigating; and 3) the decreased efficiency of the investigation resulting from repeated contacts with individuals whose identity as drug peddlers was already established."

The trial judge also found that Ross had been arrested only two days after the investigation conducted by Private Bush had been closed. In my appraisal, the substantial traffic in narcotic drugs in the District of Columbia was properly under attack in this case, just as in others like it. See, *e. g.*, Morgan v. United States.[12]

It is common knowledge that the spread of addiction results almost entirely from sales by one who is a user. It is primarily on that account that the Federal Bureau of Narcotics directs its activity against those who traffic in heroin in the Bureau's effort to reduce the availability of the contraband to a minimum. According to Commissioner Henry L. Giordano, the records of the Bureau of Narcotics demonstrate that at least 125 *new* cases of addiction annually occur in the District of Columbia.[13] The President's Advisory Commission on Narcotic and Drug Abuse reached the conclusion:

"The illegal traffic in drugs should be attacked with the full power of the federal government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive." [14]

Because I fear great mischief will flow from the court's action in this case, I respectfully dissent.

12. 115 U.S.App.D.C. 310, 319 F.2d 711, rehearing *en banc* denied, cert. denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963). There the court noted:
   "The convictions rest primarily upon the testimony of an officer of the Narcotics Squad that he bought narcotics from appellant. True, there was alibi evidence on behalf of appellant, but the question of his guilt was for the jury to decide, and this they did."

13. In testifying before the House Committee on Appropriations, 88th Cong., 2d Sess., Commissioner Giordano introduced for the record various charts. The District of Columbia was shown fifth among the ten leading cities in the United States in active narcotics addicts as of December 31, 1963 with a known total of 1.021 addicts. His statistics of *new* narcotics addicts over the five years listed read:

|  | 1959 | 1960 | 1961 | 1962 | 1963 |
|---|---|---|---|---|---|
| District of Columbia | 125 | 159 | 130 | 127 | 133 |

14. Final Report, November 1963, p. 3.