**William Bart HAMILTON**

**v.**

**Honorable James B. LUMPKIN.**

**Civ. A. No. 74–0083–R.**

United States District Court, E. D. Virginia, Richmond Division.

March 4, 1975.

Scott H. Swan, Murray J. Janus, Bremner, Byrne & Baber, Richmond, Va., for plaintiff.

Linwood T. Wells, Asst. Atty. Gen. of Va., Richmond Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, William Bart Hamilton, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court convictions upon three felony in-

dictments for the distribution of marijuana by the Hustings Court for the City of Richmond (now the Circuit Court for the City of Richmond, Division I) on the ground that the delay between the dates of the offenses charged and the date of his arrest substantially prejudiced his right to a fair trial and due process of law under the Fifth and Fourteenth Amendments to the Constitution. Petitioner contends that his convictions and the restrictions imposed upon his liberty pursuant thereto are illegal and names the Honorable James B. Lumpkin, Judge of the Circuit Court for the City of Richmond, Division I, as respondent.

Presently before the Court are respondent's motions to dismiss the petition for its failure to state a claim upon which relief can be granted and to substitute Andrew J. Winston, City Sergeant for the City of Richmond, as party respondent. Moreover, at the Court's direction, the parties have filed memoranda upon, have argued the merits of, and have furnished the Court a transcript of all state court proceedings involving petitioner's claim. Upon the complete record before it, the Court deems this matter and all motions pertaining thereto ready for final disposition.

### Statement of Facts

Petitioner was arrested on December 7, 1971 upon three warrants charging him with distributing marijuana in violation of Section 54–524.101 of the Code of Virginia (1950). Two of the warrants were issued on June 24, 1971 on the basis of information provided by Virginia State Police Trooper A. G. Segar, alleging separate sales of marijuana to him by petitioner at 6:15 p. m. on October 9, 1970 and at 10:58 p. m. on December 8, 1970. The third warrant was issued on the day of the arrest on the basis of information provided by State Trooper R. E. Lackey alleging a sale of marijuana to him by petitioner also at 10:58 p. m. on December 8, 1970. At the time of the offenses charged, Troop-ers Segar and Lackey were on special assignment as undercover narcotics agents in the City of Richmond.

On February 8, 1972, a hearing was held before the respondent on petitioner's motion to quash the indictments which had been issued on January 3, 1972. At the hearing, Trooper Segar testified that he went undercover in late July or early August of 1970 and that he broke cover on June 24, 1971. He stated that as a result of his undercover work, some twenty to twenty-five arrests were made. Trooper Segar also testified that he made contemporaneous notes with each offense he witnessed and that, while he referred to those notes concerning the circumstances surrounding the alleged sale of marijuana to him by the petitioner on October 9, 1970, he would have recalled the details even without the notes. He further stated that he knew petitioner very well and had lived in an apartment in the same rooming house occupied by the petitioner during the period of August through November or December of 1970.

Trooper Segar was also questioned concerning attempts made to arrest the petitioner after June 24, 1971. In response, Segar stated that between June 24th and August 1st he made two trips to northern Virginia in an effort to locate petitioner at his parents' home. He indicated that on one occasion he called the home of the petitioner's parents and spoke with an individual who identified himself as petitioner's brother. Trooper Segar stated that he was at that time given directions to the house but when he attempted to visit the home he was unable to locate it. He indicated that there was no reason not to arrest petitioner after June 24th, but he was simply unable to locate him. Segar stated that after August 1, 1971, he returned to duty as a highway patrolman and made no further attempt to locate petitioner until December 7, 1971, when he was placed on special assignment in Richmond to assist Trooper Lackey in executing the arrest warrants Lackey had obtained as a result of his undercov-

er work. Finally, Trooper Segar testified that after August 1st he turned the arrest warrants for petitioner which had been issued on June 24, 1971 over to other state policemen for possible service.

Also testifying at the hearing was Trooper Lackey who indicated that he remained undercover from September 1970 until December 7, 1971. He stated that while he did not know petitioner very well, he had met petitioner at Trooper Segar's apartment and knew him by face and name. Trooper Lackey testified that he too kept notes on offenses committed in his presence during his undercover assignment and he referred to his notes concerning the alleged sale of marijuana to him by petitioner on December 8, 1970 because he could vaguely recall what had happened. Lackey did state, however, that Trooper Segar was present when he purchased the marijuana from petitioner on December 8th. When questioned as to why he had stayed undercover for such an unusually long period, Trooper Lackey stated that since Trooper Segar and a Trooper Himmelright had been exposed in July of 1971, it was necessary for him to continue his assignment until another agent could be established in the area in which he was working.

Petitioner also testified on his own behalf at the February 8th hearing and indicated that during the fall of 1970 he was a member of the Virginia Commonwealth University football team. He stated that football team practices during the season were held Monday through Thursday from 6:00 to 8:00 p. m. and on Fridays from 6:00 to 7:00 p. m. Petitioner testified, when asked what he was doing at 6:15 p. m. on Friday, October 9, 1970, that while it had been a long time since that day, he had regularly attended practices and was "pretty sure" he was at practice on the evening in question. Petitioner also stated that the manager of the football team kept a log of those attending football practice sessions and that while he had attempted to locate the log, it had

been thrown away "when they threw away things that had to do with the 1970 season." As to his whereabouts or activities on December 8, 1970, petitioner testified that he could not recall.

Petitioner further stated that he made no attempt to avoid the police from October 9, 1970 until the time of his arrest on December 7, 1971. He indicated that while he had changed his residence on several occasions he had always up-dated his records at the university. Moreover, during the summer months of 1971, he resided at his parents' home in Annandale, Virginia and that their address was also listed on his records at school. Petitioner further stated that he knew Troopers Segar and Lackey and that Segar had lived in the same rooming house as petitioner and had visited petitioner's apartment on three occasions.

Finally, two football teammates of petitioner testified. While both stated that they could not recall what petitioner was doing on October 9 or December 8, 1970, they did state that petitioner started the team's game on Saturday, October 10, 1970, which, according to the team's policy, meant it was necessary for petitioner to be at practice on October 9th. One of the two witnesses also indicated that he was aware that an attendance log was kept for practices held in the fall of 1970 and that, while he had no idea of the length of time for which the log was retained, he thought it was most likely thrown away at the end of the season.

At the close of the hearing, respondent took petitioner's motion under advisement. On March 28, 1972, respondent denied petitioner's motion, stating that while the time element seemed to be at odds with the petitioner's right to due process, the court was satisfied that the delay between October 1970 and June 1971 was not unreasonable. Moreover, the court interpreted the Supreme Court's holding in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed. 2d 468 (1971), as requiring a defendant to show that a pre-arrest delay caused both substantial prejudice to the defend-

ant's rights to a fair trial and was a purposeful device to gain a tactical advantage over the accused. Finding the second element of this two-fold requirement lacking, the court allowed the indictments against petitioner to stand.

On April 17, 1972, petitioner was tried before the respondent sitting without a jury. The Commonwealth's case consisted of the testimony of Troopers Segar and Lackey and that of a state chemist who had analyzed the substance allegedly purchased from the petitioner as marijuana. Petitioner's case consisted of his own testimony, that of three former football teammates and that of the football team manager. Petitioner and his teammates testified that petitioner was in fact at football practice at 6:15 p. m. on October 9, 1970. Two of his teammates also stated that other coaches were at the October 9th practice in addition to the team's head coach who, to the best of their knowledge, had since left the state. Neither petitioner nor his teammates could recall petitioner's whereabouts on the night of December 8, 1970. The football team manager testified that while the petitioner had asked him in December of 1971 to look for the attendance log for football practices held in the fall of 1970, he had been unable to locate it. He also stated that while the coach's policy was that a player could not start a Saturday game if he had not attended the previous evening's practice session, exceptions were made to this rule.

At the close of trial, the court continued the matter until June 8, 1972, at which time the respondent found the petitioner guilty as charged on all three indictments. On August 25, 1972, the court suspended imposition of sentence in each of the cases conditioned on petitioner's good behavior and that he be on strict probation subject to the supervision of the probation officer. On December 21, 1972, the petitioner petitioned the Supreme Court of Virginia for a Writ of Error to the judgment of the Hustings Court alleging the denial of his right to a speedy trial and due process of law. The petition was denied on August 16, 1973. Petitioner, having thus exhausted his state remedies as required by 28 U.S.C. § 2254, filed his petition with this Court on February 19, 1974.

### Motion to Dismiss

With respect to respondent's motion to dismiss, respondent has erroneously characterized petitioner's claim before this Court as one based upon the alleged denial of petitioner's right to a speedy trial under the Sixth Amendment to the Constitution. While petitioner represents that such a claim was one of two raised by him in petitioning the Supreme Court of Virginia for a Writ of Error, petitioner has now apparently abandoned that allegation. Instead, petitioner relies solely upon the second claim presented to the Virginia Supreme Court, that is, the denial of his right to due process of law.

On motion by respondent to dismiss, all the material allegations of the petition must be accepted as true. *Cf.* Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Moreover, within this Circuit, a petition may not be dismissed "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his complaint." Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969), citing Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Accordingly, since the Court finds that petitioner has raised issues of fact which, if resolved in his favor, would entitle petitioner to relief, respondent's motion to dismiss must be denied.

### Motion to Substitute

With respect to respondent's motion to substitute City Sergeant Winston as party respondent, it appears from the face of the motion that petitioner is neither presently incarcerated under Winston's supervision nor has Winston any supervisory authority over

petitioner whatsoever. On the contrary, while petitioner was released from supervised probation by respondent on August 25, 1972, it is clear under Virginia law that a sentencing court retains the authority to activate petitioner's sentence at any time during the maximum period for which petitioner might have originally been sentenced. Va.Code Ann. § 53-275; Berry v. Commonwealth, 200 Va. 495, 106 S.E.2d 590 (1959), which, in petitioner's case is a period of forty years. See Va.Code Ann. § 54-524.101. There is, therefore, no question that petitioner is "in custody" for purposes of the federal habeas corpus statutes, Walker v. Dillard, Mem. decis. No. 73-1108 (4th Cir., June 20, 1973), and that the sentencing judge, the Honorable James B. Lumpkin, is the proper party respondent. Greene v. Winston, C.A. No. 174-73-R (E.D.Va., July 24, 1973). Accordingly, respondent's motion to substitute must also be denied.

### Due Process Claim

In the matter *sub judice,* petitioner alleges that the twelve and fourteen month delays between the dates of the alleged offenses and the date of his arrest substantially prejudiced his ability to prepare his defense and that he was, therefore, denied his rights to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the Constitution.[1] More specifically, petitioner contends that the loss of physical evidence (the football practice attendance log) and the disappearance of at least one critical witness (the football coach) together with the inability of two potential witnesses (petitioner's football teammates) and the plausible inability of petitioner himself to recall his whereabouts on the dates the alleged

offenses occurred, prevented the petitioner from being able to adequately defend himself. Petitioner further alleges that the delays were unreasonable and unjustified and resulted from the state's deliberate choice to defer petitioner's arrest in order to allow the undercover officers to obtain evidence against other individuals then under investigation. Therefore, petitioner submits, this coupling of alleged actual prejudice with an unjustified delay requires a finding that petitioner is now in custody in violation of the Constitution of the United States. On the basis of the record and briefs before it, however, the Court concludes to the contra.

In United States v. Marion, *supra,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Supreme Court ruled that the statute of limitations does not fully define a defendant's rights with respect to the events occurring prior to indictment. While recognizing that the government itself had conceded that the Due Process Clause would require dismissal of the indictment if it were shown that the pre-indictment delay caused substantial prejudice to the defendant's rights to a fair trial and that the delay was an intentional device by the government to gain tactical advantage over the accused, the Court proposed a more flexible approach:

> However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution.

1. While claims of pre-accusation delay have generally been raised under the Fifth Amendment by defendants in federal criminal proceedings, they have been recognized on at least one occasion within this circuit in the context of a state prisoner habeas corpus petition. See McLawhorn v. North Carolina, 484 F.2d 1, 3 n.7 (4th Cir. 1973). Although in *McLawhorn* the Fourth Circuit disposed of the petition on other grounds, therefore finding it unnecessary to consider the merits of the claim, this Court is satisfied that petitioner's claim is cognizable pursuant to 28 U.S.C. § 2254(a) as involving a right protected by the Fourteenth Amendment. See Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. 404 U.S. at 324–25, 92 S.Ct. at 465.

Since *Marion,* at least one court has suggested that "it is unclear from the opinion whether a successful claim under the due process clause must establish both actual prejudice and intentional delay on the part of the Government or whether a showing of the former alone would be sufficient." United States v. Iannelli, 461 F.2d 483, 485 n. 2 (2d Cir. 1972), cert. denied, 409 U.S. 980, 93 S.Ct. 310, 34 L.Ed.2d 243 (1972). This Court, however, finds nothing in *Marion* other than the mere concession by the government to create such uncertainty. Nor, for that matter, does the Court concur in the view expressed by the state trial court in denying petitioner's motion to quash that *Marion* must be read as calling for dismissal of a prosecution only if both deliberate delay and actual prejudice are shown.[2] Rather, this Court concludes that a valid due process claim on the basis of pre-accusation delay can be established in either of two ways.

First, the Court believes that a valid due process claim is made out by a showing that the state intentionally chose to delay apprising a defendant of the charges for which he stands accused. In the Court's view, such a situation is analogous to the state's knowing use of perjured testimony, see Mooney v. Holo-

han, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), or its suppression of exculpatory evidence following a defendant's request for such material, see Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in that this casting of "the prosecutor in the role of an architect of a proceeding . . . does not comport with standards of justice." 373 U.S. 88, 83 S.Ct. 1197. While, in the instant matter, the Court finds the record void of evidence to substantiate a finding of such an abuse of prosecutorial discretion, this does not put an end to the Court's inquiry into the merits of petitioner's claim. For, even in the absence of such a showing, the Court concludes that a valid due process claim is established by demonstrating that the petitioner has suffered actual prejudice to his defense. United States v. Giacalone, 477 F.2d 1273 (6th Cir. 1973); United States v. Golden, 436 F.2d 941 (8th Cir.), cert. denied, 404 U.S. 910, 92 S.Ct. 236, 30 L.Ed.2d 183 (1971); United States v. Baker, 424 F.2d 968 (4th Cir. 1970).

In this regard, petitioner properly places considerable reliance upon Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), which was the first in what has developed into a long line of cases emanating from the District of Columbia Circuit involving the specific problem of delay between the alleged commission of a narcotics crime and the arrest of the accused.[3] In *Ross,* the Court reversed a narcotics conviction on a record which, as the Court described it, showed "(1) a purposeful de-

---

2. If such an interpretation were correct, it would have been unnecessary for the Court in *Marion* to have gone on to consider, as it did, the appellee's claim of an intentional tactical delay once the Court had determined that the appellees had failed to prove actual prejudice to their defense. Yet, the Supreme Court clearly gave consideration to each element when it stated: "No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." 404 U.S. at 325, 92 S. Ct. at 466.

3. While *Ross* and its progeny have been described as being based upon the Court of Appeals' purported supervisory jurisdiction over criminal trials in the District of Columbia and as taking a more rigid stance against pre-indictment delays in narcotics cases where the government relies on secret informers and single transactions, see United States v. Marion, *supra,* 404 U.S. at 315 n. 8, 92 S.Ct. 455, the principle established in those cases has been expressly acknowledged by this circuit. See United States v. Harbin, 377 F.2d 78, 80 (4th Cir. 1967).

lay of seven months between offense and arrest, (2) a plausible claim of inability to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook." 349 F.2d at 215.

More recently, in Robinson v. United States, 148 U.S.App.D.C. 58, 459 F.2d 847 (1972), the District of Columbia Court of Appeals undertook an exhaustive review and analysis of *Ross* and the cases within that circuit in which the principles of *Ross* have been applied. Judge Spottswood W. Robinson, III, in writing for the panel in *Robinson*, first noted that the judicial task in such matters is the reconciliation of the competing needs of effective law enforcement, including the fact that the efficient utilization of undercover personnel demands extension of their anonymity for the periods during which their assignments are carried out, and early notice of the accused-to-be of the impending accusation. Moreover, Judge Robinson stated that "cases since *Ross* have attempted to strike the proper balance, mindful that 'the risk of conviction of an innocent person' 'attributable to the process which led to the verdict of guilt' is the central concern of the *Ross* ruling." 459 F.2d at 851 (footnotes omitted).

While noting that the many cases in this area have been fact-specific, Judge Robinson suggested that all cases agree that the two prime factors to be considered are the reasonableness of the delay and the resulting harm, if any, to the accused. With regard to the former, Judge Robinson noted:

> Justification for delay is measured largely though not exclusively by the desirability of keeping the undercover agent's identity secret to enable him to track down as many narcotics traffickers as possible while he is useful. While some amount of delay is administratively inevitable, and by the same token is legally permissible, courts

must consider the adverse effects of delay upon the accused. 459 F.2d at 851–52.

Finding that delays of four months or less are generally presumed to be reasonable, Judge Robinson did suggest that even where the agent emerges within the four month period, the government will be required to make a diligent effort to promptly find and notify the accused of the charges against him.

As to resulting harm to a defendant, Judge Robinson noted two types of prejudice—or "special circumstances"—generally alleged. The first of these involves claims, such as in the case at bar, in which the accused contends that the delay damaged his ability to defend himself. In such instances, Judge Robinson stated that the burden is on the accused to come forward with a plausible claim of prejudice. He also noted that a claim frequently made is that the accused cannot remember where he was during the short period of time the narcotics transaction consumed, usually some months before. With respect to such averments of prejudice, Judge Robinson noted:

> The length of the delay, even if ordinarily reasonable, is obviously relevant in assessing injury of this sort. Any inference that harm did result is negated when the accused testifies in detail, or brings forward an alibi witness, or perhaps even when he holds a steady job. Another variation of the claim that the defense has suffered from the delay is the assertion that a material witness has become unavailable. Any loss of such a witness which is chargeable to the delay weighs heavily against the Government in these cases. 459 F.2d 852–53.

The second category of special circumstances frequently encountered in cases of pre-accusation delay relates to the quality of the government's proof and the reliability of the techniques utilized to identify the accused. Recognizing the conditions under which narcotics are traded creates a danger of misidentification, Judge Robinson summarized the

prior decisions of the District of Columbia Circuit as follows:

> We have been particularly cautious when the only evidence is the uncorroborated testimony of an undercover agent who had but a single brief encounter with the alleged offender. We have been even more prone to dismiss an indictment when the undercover agent did not know the seller before the sale, took only scanty notes, and identified him from pictures of narcotics suspects some time after the sale, than when more careful procedures have been followed. We have, on the other hand, recognized that multiple contracts between agent and seller tend to strengthen any later effort by the agent to point out the guilty party. 459 F.2d at 853.

In conclusion, Judge Robinson noted that the decisions of the Court lay down no rules as to the weight to be assigned to these factors, calling instead for judicial judgment of the most delicate type. He did state, however, that *Ross* itself was about the paradigm case in that there the delay was unnecessary, the claim of prejudice was plausible, and the process of identification was particularly suspect.

Applying these principles to the facts before it, the Court is initially faced with a two-fold problem with respect to the reasonableness of the delay in apprising petitioner of the charges against him. As to the two warrants obtained by Trooper Segar on June 24, 1971, there was an eight and one-half month delay between the first alleged sale of marijuana by petitioner on October 8, 1970 and the trooper's emergence from cover on June 24th. Moreover, there was an additional five and one-half month delay between the trooper's emergence and the arrest of the petitioner on December 7, 1971.

With regard to the former period, the only justification offered by the state is that common to all undercover work, that is the need to protect the agent's anonymity. While the Court does not wish to minimize the importance of this protection, on balance, so lengthy a period of assignment serves only to heighten the likelihood of prejudice to the accused. As to the latter period, however, the Court is far from satisfied that a diligent effort was made by Trooper Segar to locate and notify the petitioner, a student whose school and home addresses were on file with the university he was then attending. The Court simply cannot accept as a fact that a state police officer, given the address of petitioner's parent home, acted with any degree of care and still, as Trooper Segar related, found it physically impossible to locate the residence.

Moreover, the record is clear that no effort whatsoever was made by state police authorities to serve the warrants obtained by Trooper Segar after August 1, 1971 until the time of petitioner's arrest on December 7, 1971. Therefore, unlike instances where the police have made a serious attempt to locate the accused, see *e. g.,* United States v. Parish, 152 U.S. App.D.C. 72, 468 F.2d 1129 (1972), on the basis of the evidence before it, the Court concludes that the police were, at best, grossly negligent in failing to serve Trooper Segar's warrants within a reasonable time after their issuance. This factor alone weighs heavily against the state.

The second aspect of the delay question concerns the warrant obtained by Trooper Lackey on December 7, 1971 and served on the petitioner later that day. While under ordinary circumstances a delay of twelve months between the alleged commission of a crime, on the one hand, and the agent's emergence and the arrest of the accused, on the other, will create a presumption of unreasonableness, there is evidence to indicate that Trooper Lackey's inordinately lengthy assignment resulted from the need to maintain continuity in police surveillance of illicit narcotics activity. Such being the case, the length of the delay weighs somewhat less heavily against the state, although it must be considered in terms of its adverse impact, if any, upon the petitioner's defense.

■ Petitioner has also alleged special circumstances of the sort involving an impairment of his ability to present his defense. With regard to the charges arising out of the two alleged sales on December 8, 1970, however, petitioner alleges only an inability to recall what happened on the day of the offenses. While the Court would not reject this claim out-of-hand in light of the length of time which had passed prior to petitioner's arrest, such a claim, standing alone, is insufficient to constitute prejudice resulting from a pre-accusation delay. United States v. Baker, 424 F.2d 968 (4th Cir. 1970).

In terms of the alleged sale of marijuana by petitioner on October 9, 1970, petitioner's claim is more substantial. As to the loss of the football practice attendance log, its admission into evidence at trial, if it did in fact indicate petitioner had attended practice on the evening in question may well have had the cumulative effect of creating reasonable doubt as to petitioner's guilt. However, testimony at the pre-trial hearing from one Daniel W. King, a teammate of the petitioner, indicated that it was likely the log was discarded at the conclusion of the 1970 football season, which would have been approximately November of 1970. On the basis of this testimony, it would appear that the log became unavailable long before an advanced stage of the delay had been reached. *Contra* Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 (1966).

Moreover, with regard to disappearance of petitioner's football coach, other testimony offered at trial by both petitioner and his teammates suggested other coaches had been present at the October 9, 1970 practice session. Yet these individuals were apparently not called to testify nor is there any indication that they were likewise unavailable at the time of trial. In this sense, the Court finds it questionable whether petitioner had, as a result of the delay, lost the testimony of a witness who was material to his defense.

Most importantly in the Court's view, however, and the factor which weighs most heavily against the petitioner, is the manner in which petitioner was identified by the state police investigators. Even assuming Trooper Lackey could vaguely recall the events of December 8, 1970 without the aid of his notes, there was ample testimony presented to negate any possibility of misidentification: Trooper Segar stated that he lived in the same rooming house as the petitioner for at least three months and that he knew petitioner well; Trooper Lackey stated he knew the petitioner by face and name and that Trooper Segar was present at the alleged sale by the petitioner to Lackey on December 8, 1970; and petitioner himself admitted to knowing both Segar and Lackey and to visiting Segar's apartment on three occasions.

■ In reaching a delicate judgment based on the circumstances of this case, the Court must conclude that the petitioner has not proved such actual prejudice to his defense which would warrant a finding of a deprivation of his rights to a fair trial and due process of law. Accordingly, the Court will deny the petition for a writ of habeas corpus.

An appropriate order will issue.