482 P.2d 257

STATE of New Mexico, Plaintiff-Appellee,

v.

Mike POLSKY, Defendant-Appellant.

No. 522.

Court of Appeals of New Mexico.

Feb. 5, 1971.

Certiorari Denied March 9, 1971.

H. Gregg Privette, Privette & Privette, Las Cruces, for appellant.

James A. Maloney, Atty. Gen., John A. Darden, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

OMAN, Judge.

Defendant appeals from his conviction of unlawfully selling a narcotic drug, to wit, heroin, in violation of § 54–7–14, N.M.S.A. 1953 (Repl. 8, pt. 2, 1962). We affirm.

Defendant relies upon four stated points and numerous sub-points for reversal. We shall consider them in the order of their presentation in his brief in chief.

He argues his first two points together under two sub-points, or divisions, which he has entitled "Speedy Trial" and "Denial of Discovery." His contention, in his brief in chief under "Speedy Trial," is that he was denied his right to a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States, made applicable to the states through the Due Process clause of the Fourteenth Amendment [Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)], and Art. II, § 14, Constitution of New Mexico. However, in his reply brief he asserts that if the prejudice he claims to have suffered was not a deprivation of his right to a speedy trial, then it was a denial of due process as guaranteed by Amendment XIV, § 1, Constitution of the United States, and Art. II, § 18, Constitution of New Mexico.

The substance of his complaint, pertinent to his argument under "Speedy Trial," is that he was prejudiced by the intentional delay of the State in not arresting him until May 5, 1969, for the offense he was charged with having committed on March 26, 1969, when the State had all its evidence against him as of the date of the commission. He contends that by reason of this delay he was deprived of the testimony of certain witnesses at his preliminary hearing on June 16, 1969, which would have been available to him had his arrest not been delayed to coincide with the arrest of some twenty-seven other per-

sons also charged with narcotic drug violations.

His position is that the State had planned undercover narcotic investigations at New Mexico State University from September 1968, and had planned to make mass arrests in May of 1969. These mass arrests were referred to as the "May bust." Defendant and some of the others arrested were students at the University, and others of them apparently just associated with students and spent time about the University. The spring semester at the University terminated some time during the latter part of May or first part of June. The exact date of this termination does not appear in the record, but it was after May 5, the date of the arrests, and before June 9, the date of the preliminary hearing of one of the others arrested, and at which preliminary hearing were present the witnesses defendant contends were lost to him. He claims immediately after the preliminary hearing on June 9 the witnesses began to scatter and he was unable to locate them or get them as witnesses on his behalf at his preliminary hearing on June 16.

It appears from the record that defendant's contention in the trial court related solely to his claimed denial of a speedy trial, and, as already stated, in his brief in chief he relies entirely upon this constitutional right. In the trial court and in this appeal he has consistently taken the position that his " * * * argument is not with the time which elapsed between date of arrest and the trial, * * * " but with the time which elapsed between the date of the commission of the alleged offense, to wit, March 26, 1969, and the date of the filing of the criminal complaint in the magistrate court and his arrest, to wit, May 5, 1969.

■ The State takes the position the constitutional guarantee of a speedy trial has no application until after the formal institution of the prosecution, which in this case was May 5, by the filing of the complaint and the arrest of defendant. It

relies upon the following cases in which it was held the right of a speedy trial arises, or comes into application, only upon the initiation of the formal prosecution pro-. ceedings, and with which holdings we agree. McConnell v. United States, 402 F.2d 852 (5th Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1208, 22 L.Ed.2d 464 (1969); Foley v. United States, 290 F.2d 562 (8th Cir. 1961), cert. denied, 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88 (1961); State v. French, 104 Ariz. 359, 453 P.2d 505 (1969); State v. Trotter, 203 Kan. 31, 453 .P.2d 93 (1969). See also the following cases which have so held: Parker v. United States, 252 F.2d 680 (6th Cir. 1958), cert. denied, 356 U.S. 964, 78 S.Ct. 1003, 2 L.Ed.2d 1071 (1958); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963), cert. denied, 379 U.S. 905, 85 S.Ct. 198, 13 L.Ed.2d 178 (1964); State v. Saiz, 103 Ariz. 567, 447 P.2d 541 (1968); People v. Jordan, 45 Cal.2d 697, 290 P.2d 484 (1955); State v. LeVien, 44 N.J. 323, 209 A.2d 97 (1965); Click v. Eckle, 174 Ohio St. 88, 186 N.E.2d 731 (1962). Therefore, the State urges that since defendant complains only of the delay in initiating the prosecution on May 5, and since the constitutional guarantee of a speedy trial has no application to the time and events prior thereto, defendant must fail.

There is merit to the State's position, but because of the nature of defendant's claim and his arguments in support thereof, we are inclined to consider his claim as raising a due process issue, which we feel is more properly the area within which an issue such as presented by him properly falls. See Ross v. United States, 121 U.S. App.D.C. 233, 349 F.2d 210 (1965); Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 (1966); United States v. Deloney, 389 F.2d 324 (7th Cir. 1968); United States v. Evans, 385 F.2d 824 (7th Cir. 1967); United States v. Lee, 413 F.2d 910 (7th Cir. 1969); United States v. Stanley, 422 F.2d 826 (9th Cir. 1969).

However, we recognize there are authorities which have held, or seem to suggest, the right to a speedy trial has application to, or embraces, times and events which precede the initiation of formal charges by the State. Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); State v. Baca, (Ct.App.), 82 N.M. 144, 477 P.2d 320, decided November 13, 1970; United States v. Rivera, 346 F.2d 942 (2d Cir. 1965); Scott v. State, 84 Nev. 530, 444 P.2d 902 (1968); United States v. Capaldo, 402 F.2d 821 (2d Cir. 1968).

As already stated, we agree with the jurisdictions which have clearly and expressly passed upon this question, and which have held the constitutional right to a speedy trial arises, or becomes applicable, only upon the initiation of formal prosecution proceedings. Pre-arrest, or pre-formal prosecution, delays may, however, constitute a denial of due process. State v. Baca, supra; Ross v. United States, supra; Woody v. United States, supra; United States v. Lee, supra; United States v. Deloney, supra; United States v. Evans, supra; United States v. Jones, 403 F.2d 498 (7th Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969); United States v. Feinberg, 383 F.2d 60 (2d Cir. 1967); Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705 (1965).

The trial court, in denying defendant's motions directed toward his claim of prejudice, observed that the State had a substantial public interest in the effectiveness of undercover police work and was not bound to immediately arrest defendant after his commission of the offense on March 26, and thereby destroy the effectiveness of its planned police work in apprehending a number of other narcotics law violators. The undercover police investigation was apparently concluded in late April or early May, and defendant was arrested very shortly thereafter.

■ Certainly the delay of forty days between the commission of the offense and the arrest was not in itself suggestive of prejudice. State v. Baca, supra. There is not here involved any questionable identification of defendant, or any question of incapacity on the part of defendant, the

undercover agent, or the police officer, who accompanied the undercover agent until shortly before the agent made the purchase of heroin from defendant, to recall the time, place and events surrounding the sale by defendant. Defendant denied making the sale, but he testified clearly and without hesitation concerning his meeting with the undercover agent at the time and place of the consummation of the sale. The undercover agent and the other officer also testified clearly as to the events on the evening of the sale.

As already stated, defendant relies entirely upon his claim of prejudice because the "May bust" closely coincided with the termination of the spring semester at the University, and his claim that he was thereby deprived of the presence of witnesses at his preliminary hearing on June 16. The circumstances here are not such as to bring defendant within the principles announced in either Ross v. United States, supra, or Woody v. United States, supra, upon which he primarily relies.

Certainly, after he was charged and arrested on May 5, he knew he would be called upon to resist the charges. He employed an attorney within two or three days after his arrest to represent him in resisting the charges. Although the date when the semester ended is not shown by the record, defendant testified his arrest and subsequent incarceration for four or five days preceded the week of final examinations. The record reflects in one of his tenders of proof that he was arrested two weeks before the semester ended, and there are references in the record to the semester having ended in the latter part of May or first part of June. In any event, it is conceded all the witnesses he claims were unavailable to him on June 16 were present at the preliminary hearing of another defendant on June 9. Defendant's attorney had received notice by letter dated May 27 that defendant's preliminary hearing would be conducted on June 16, and the attorney was present at the pre-liminary hearing on June 9 when all the claimed witnesses were present.

Under these circumstances, we are unable to hold defendant's constitutional rights were prejudiced by any actions on the part of the State. The State was in no way responsible for defendant's failure to have available on June 16 some witnesses who may have been able to properly attack the undercover agent's general reputation for credibility. It is not contended any of the claimed absent witnesses had knowledge of or could testify to any of the circumstances surrounding the sale, or could in any way directly rebut the State's evidence in regard thereto. The most defendant could have accomplished by their presence would have been an indirect attack on the State's case by attacking the general credibility of the undercover agent. If defendant wished to make such an indirect attack on the State's case, he should have exercised reasonable diligence in preparing the attack.

Under "Denial of Discovery," defendant contends the trial court erred (1) in denying his "Motion for Dedimus Postestatum," by which he sought authority to take the sworn testimony of a Mr. Gaither, who lived in New York, and who defendant alleged had "personal knowledge of matters touching on the credibility * * *" of the undercover agent, and (2) in denying his motion to take the deposition of a Mrs. Zappia, who lived in Iowa, and who defendant alleged would testify to acts committed by the undercover agent which would discredit him as a witness. Defendant relies upon State v. Turner, 81 N.M. 571, 469 P.2d 720 (Ct.App.1970); Mascarenas v. State, 80 N.M. 537, 458 P.2d 789 (1969); State v. Tackett, 78 N.M. 450, 432 P.2d 415, 20 A.L.R.3d 1 (1967); State ex rel. Hanagan v. Armijo, 72 N.M. 50, 380 P.2d 196 (1963); Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). None of these cases are in point. The Turner, Mascarenas, Tackett and Jencks cases all dealt with the rights of a defend-

ant to have produced by the State exculpatory matters, or certain documents, from the State's files of the case. None dealt with the question of the taking of depositions in a criminal case. In the Armijo case it was stated that:

"* * * there is no question but that under the common law, the defendant had no right to perpetuate the testimony or to take depositions of witnesses, either for or against him. In New Mexico, we have no statute nor any rule of court which authorizes the taking of depositions in a criminal case, and, therefore, the common law is still in effect on this subject."

Defendant, however, seeks to avoid the effect of the quoted language from the Armijo case and to bring himself within the embrace of the following language taken from the opinion in the Turner case:

"* * * Discovery is accorded where to deny it deprives a defendant of a constitutional right, see Mascarenas v. State, supra, and where a particularized need has been demonstrated, State v. Tackett, 78 N.M. 450, 432 P.2d 415, 20 A.L.R.3d 1 (1967); cert. denied, 390 U.S. 1026, 88 S.Ct. 1414, 20 L.Ed.2d 283 (1968). * * *"

Defendant argues that the delay of forty days between the commission of the alleged offense and his arrest constituted a deprivation of his constitutional rights, and "* * * The particularized need was to present witnesses in his defense, lost to him by the State's action." He must fail in this argument because, as above shown, he was not deprived of his constitutional rights, and the witnesses were not lost to him by any action of the State.

In his third point relied upon for reversal, defendant asserts the evidence was insufficient to support the verdict, and the errors committed by the trial court were such as to constitute cumulative error requiring reversal.

■ The responsibility of an appellate court is to review the trial proceedings, consistent with principles of appellate review, for the purpose of making sure the accused had a fair trial, consistent with applicable principles of law and rules of procedure. In making this review, the appellate court must affirm a conviction unless the record reveals a very real possibility of a miscarriage of justice. State v. Chacon, 80 N.M. 799, 461 P.2d 932 (Ct. App.1969).

In determining whether there is substantial evidence to support a conviction, the appellate court must view the evidence in the light most favorable to the State, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict. State v. Parker, 80 N.M. 551, 458 P.2d 803 (Ct.App.1969). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate support for a conclusion. State v. Encee, 79 N.M. 23, 439 P.2d 240 (Ct. App.1968). The fact that there were conflicts in the evidence does not make the State's evidence insubstantial. State v. Mora, 81 N.M. 631, 471 P.2d 201 (Ct.App. 1970). The appellate court may not properly substitute its judgment for that of the jury as to credibility of the witnesses or the weight to be given the evidence. Gallegos v. Wilkerson, 79 N.M. 549, 445 P.2d 970 (1968); State v. McAfee, 78 N.M. 108, 428 P.2d 647 (1967); State v. Tafoya, 80 N.M. 494, 458 P.2d 98 (Ct.App.1969); Rein v. Dvoracek, 79 N.M. 410, 444 P.2d 595 (Ct.App.1968).

Defendant argues that the undercover agent was impeached as a matter of law. He cites no authority for his position. However, our review of the record convinces us otherwise.

■ He also urges the trial court erred in not permitting him to read to the jury as evidence certain criminal statutes. His claim is the evidence showed the undercover agent had committed violations of these statutes, and, therefore, he was entitled to read the statutes to the jury as evidence that the agent was a criminal and was not to be believed. His offer ob-

viously did not comply with the proof required to establish the witness' conviction of a crime as provided in § 20–2–3, N.M. S.A.1953 (Repl. 4, 1970). The reading of the statutes was not essential to proof of bad moral character, if this is what defendant was seeking to accomplish. Section 20–2–4, N.M.S.A.1953 (Repl. 4, 1970). The witness was not on trial for violations of these tendered statutes, and the jury in this case could not properly have determined his guilt or innocence of any such violations. The trial court did not err in refusing the tender.

■ Defendant refers to the undercover agent as an informer, and we shall so consider him for the purpose of defendant's attack upon the sufficiency of the evidence to support his conviction, although the undercover agent was a police officer. Defendant takes the position that this court should qualify its decision in State v. Maes, 81 N.M. 550, 469 P.2d 529 (Ct.App.1970), that a defendant may be convicted on the uncorroborated testimony of an informer. He argues that we should adopt the rule relative to the necessity for corroboration of the testimony of an accomplice and of a victim of rape. As to the necessity for corroboration of the testimony of an accomplice, defendant is in error. State v. Gutierrez, 75 N.M. 580, 408 P.2d 503 (1965); State v. Turnbow, 67 N.M. 241, 354 P.2d 533, 89 A.L.R.2d 461 (1960); State v. Maes, supra. As to the extent of the corroboration required, and the reasons for requiring corroboration of the testimony of an alleged rape victim, see State v. White, 77 N.M. 488, 424 P.2d 402 (1967); State v. Shouse, 57 N.M. 701, 262 P.2d 984 (1953); State v. Walton, 43 N.M. 276, 92 P.2d 157 (1939); State v. Shults, 43 N.M. 71, 85 P.2d 591 (1938); State v. Ellison, 19 N.M. 428, 144 P. 10 (1914); State v. Carrillo (Ct.App.) 82 N.M. 257, 479 P.2d 537, decided December 11, 1970. Even if we were to modify the holding in State v. Maes, supra, so as to make it conform to the rule requiring coroboration in rape cases, the evidence would still

be sufficient to sustain defendant's conviction. However, we reaffirm the rule announced in State v. Maes, supra, that a defendant may be convicted on the uncorroborated testimony of an informer.

Defendant next contends the trial court erred in permitting a Miss Halliday to testify. She had been convicted at a prior trial for making a sale of heroin to the undercover agent about thirty minutes prior to the sale made to this agent by defendant. As we understand defendant's position, he is claiming error because the convictions of Miss Halliday and defendant arose " * * out of the same set of facts. * * *" He cites no authority for his position, and we need consider his contention no further, because the convictions did not arise " * * out of the same set of facts. * * *"

■ His concluding argument, as to the insufficiency of the evidence to support the verdict, is that the evidence shows a break in the chain of custody of the substance sold by defendant to the undercover agent, and supports a clear inference that the FBI expert, who testified the substance was heroin, did not examine the same substance forwarded for examination by the Las Cruces City Police Officer, or there had been a tampering with the package containing the same. We disagree.

The testimony of the Las Cruces City Police Officer was that he received the two plastic vials or containers from the undercover agent, and he packaged them with a slip of yellow paper and mailed them to the FBI laboratory for analysis. These vials and the slip of yellow paper were marked as State's Exhibit No. 1, and identified by the police officer as the materials he had mailed to and subsequently received back from the FBI. The FBI expert who made the analysis identified Exhibit No. 1 as the materials he received from the Las Cruces Police Department. He testified he chemically examined the contents of the vials; determined from his examinations that it was heroin; replaced the unused portions of the contents in the vials; repackaged the

**400**

vials and the yellow slip of paper; and then mailed the same to the Las Cruces Police Department, attention of the officer who had mailed the exhibit to him. The exhibit was then offered and received into evidence without objection on the part of the defendant. Compare State v. Lujan, 82 N.M. 45, 476 P.2d 65 (Ct.App.1970); State v. Harrison, 81 N.M. 623, 471 P.2d 193 (Ct.App.1970).

██ Under his third point, defendant also urges that the many errors he claims were committed by the trial court were cumulative and require reversal. The doctrine of cumulative error may be raised as an issue on direct appeal. State v. Gutierrez, 78 N.M. 529, 433 P.2d 508 (Ct. App.1967). However, defendant must fail in his contention here because (1) the trial court did not commit the many errors he claims were cumulative, and (2) because a reading of the entire record demonstrates he did receive a fair trial.

Defendant's final point relied upon for reversal is that: "A mistrial should have been declared because of the improper inflammatory and prejudicial actions of the prosecutor during the course of trial and in final argument."

By way of preface to what he says were "* * * five areas of repeated misconduct by the district attorney * * *", defendant stated he "* * * would show this Court but one example of the numerous acts calculated to inflame the jury. * * *." He then referred to alleged parading of a highly prejudicial mug shot of him before the jury. The record fails to support his contention. The mug shot was not received into evidence.

Defendant claims prejudice by reason of the district attorney's reference to the belief by Miss Halliday that defendant was a drug addict. Miss Halliday was questioned without objection about having seen defendant use heroin, about having taken heroin from him to prevent him from using it, and about a disagreement they had over her returning heroin to defendant on the date of the offense for which he was convicted. In his closing remarks the district attorney stated:

"If I remember her testimony correctly, she took this heroin from Mike Polsky because she thought he was addicted and he was hooked and she didn't want to give it back and they had an argument and as a result she gave him the heroin on the very day in question. * * *"

██ There was support for the argument in the evidence, and no objection was made to the argument. Thus, if error was committed, it was not preserved for review. See State v. Pace, 80 N.M. 364, 456 P.2d 197 (1969); State v. Hudson, 78 N.M. 228, 430 P.2d 386 (1967); State v. Montoya, 80 N.M. 64, 451 P.2d 557 (Ct.App.1968).

Defendant also complains of the district attorney's reference to defendant's hospitalization for infectious hepatitis. On cross-examination defendant was questioned about a recent hospitalization in New York City, and he stated he had been hospitalized for infectious hepatitis. When asked if infectious hepatitis could be contracted by the use of needles, objection was made and sustained to the question, and shortly thereafter the trial court instructed the jury to "* * * disregard entirely the questions in regard to hepatitis * * *"

In his closing argument the district attorney remarked:

"* * * One thing is the hesitancy of the defendant to reveal this hospitalization that the defendant had, other than the fact that it was infectious hepatitis. Infectious hepatitis, how do you get infectious hepatitis? I will ask you that. I will ask you if you remember Billie Halliday testified to you that she had seen Mike Polsky injecting himself with heroin."

██ It could reasonably be concluded from these remarks that the district attorney was suggesting defendant contracted the infectious hepatitis from injecting himself with heroin. In view of the court's ruling and admonition to the jury on the question of the cause of infectious hepatitis,

the district attorney's argument was improper. However, considering the manner of the phrasing of the remarks, the court's prior admonition to the jury, and the fact that defendant made no objections to the remarks, we are of the opinion the impropriety of the argument did not amount to reversible error, and no error was preserved for review. See State v. Hudson, supra. Nothing said in State v. Rowell, 77 N.M. 124, 419 P.2d 966 (1966), requires us to hold otherwise.

The next area of claimed misconduct on the part of the district attorney relates to his comments upon the taking of the Fifth Amendment by a witness. Her testimony, on direct examination, was that she had been a student at the University, had met the undercover agent in December 1968 or January 1969; had on one occasion seen him smoking a marijuana cigarette on the University campus; and he had supplied the cigarette and offered it to her, but she had declined the offer.

There was no evidence connecting defendant with the incident testified to by Miss Sunderland and there was no evidence in any way connecting Miss Sunderland with the offense for which defendant was convicted. It is apparent her testimony was offered by defendant solely upon the question of the agent's credibility.

On cross-examination she was asked the following questions and made the following answers without objection:

"Q. Have you ever used marijuana?

"A. I would like to plead the Fifth Amendment.

"Q. Have you ever possessed marijuana?

"A. The same.

"Q. The same what?

"A. Plead the Fifth Amendment.

"Q. Have you ever taken any other drugs other than marijuana?

"A. Plead the Fifth Amendment.

"Q. Have you ever sold any drugs?

"A. Plead the Fifth Amendment."

No instruction was given or requested to the effect that the failure of the witness to answer questions on the ground her answers would tend to incriminate her—or on her plea of the Fifth Amendment—could not be made the basis of any inference by the jury, favorable to either the prosecution or the defendant, which is a generally accepted rule of law. Billeci v. United States, 87 U.S.App.D.C. 274, 184 F.2d 394 (1950), 24 A.L.R.2d 881 (1952); Beach v. United States, 46 F. 754 (C.C.Cal. 1890); Annot., 24 A.L.R.2d 895 (1952), and cases cited therein.

As above indicated, other than the denial by defendant of having made the sale of heroin, his entire defense was directed at the credibility of the State's witnesses, and particularly the credibility of the undercover agent. In his opening argument to the jury, the district attorney strongly stressed the frankness with which the agent had admitted certain misconduct on his part, elicited by questions from defense counsel, and the difficulties under which the agent had been required to work to accomplish the undercover police purposes. As a part of his closing argument in defense of the integrity of the agent, the district attorney stated:

"* * * when somebody comes in before this Court and says that Kelly Hagen [the agent] did this, we say now, Mrs. Sutherlin, [apparently meaning Miss Sunderland] what did you do, I take the Fifth Amendment, I'm not going to tell * * * I didn't hear, Ladies and Gentlemen of the Jury, the Fifth Amendment mentioned once by Kelly Hagen, Mike Gonzales, [or] Billie Halliday [the State's witnesses] * * *"

Defense counsel, in his closing argument, made a long and extremely strong attack upon the agent's morals, character and integrity. He repeatedly referred to the agent as a liar, to answers made by the agent as lies, to the difficulties counsel had in getting answers from the agent, and to unfair and prejudicial acts on the part of

the State. He closed his argument with the following:

"One last comment, that none of these witnesses for the State took the Fifth Amendment. They didn't have to, they just lied. This little girl from Albuquerque [Miss Sunderland], now consider her on this witness stand. She came down here and she testified and she knew when she got on that stand what kind of questions were going to be asked of her and she knew it wasn't going to be pleasant and she could have lied very simply she could have pulled a Kelly Hagen. Have you ever used marijuana, she could have said no, sir. Would any one of you really questioned that girl, I think you would have bought her lie, not several, but bang, bang, bang, and she took the Fifth. Incidentally, the true meaning of the Fifth Amendment, it isn't quite as the district attorney stated to you, it is a statement that I refuse to answer on the grounds that what I say might tend to incriminate me, not that it will incriminate me. There is a big difference between who has got a hammer, the district attorney, over her. Consider the man that prosecutes, then bear that in mind when you remember how these witnesses testified. * * *"

In his rebuttal closing argument, the district attorney stated:

"He [defense counsel] talked about Miss Sunderland taking the Fifth Amendment. I think, if I am not mistaken here, he had cautioned her that she could take the Fifth and how she could take it. Ladies and Gentlemen of the Jury, our witnesses came here, Kelly Hagen bared his soul to you. * * *"

 We agree that when a witness, other than the accused, declines to answer a question on the ground his answer would tend to incriminate him, the refusal alone cannot be made the basis of any inference by the jury, either favorable to the prosecution or favorable to the defendant. Perhaps the only way of protecting against an improper inference being drawn by the jury

is for neither counsel to comment on invoking the Fifth Amendment and for the court to give a proper cautionary instruction thereon. However, it is apparent to us that the remarks of both counsel in this case as to the Fifth Amendment related solely to the question of the credibility of Miss Sunderland and the State's witnesses, and particularly as to the credibility of the undercover agent. We are of the opinion that under the facts of this case, and in the light of the remarks of both counsel, no impermissible inference as to defendant's guilt was likely to have been drawn by the jury from the remarks of the district attorney or from the refusal of Miss Sunderland to answer the questions asked of her. Compare State v. McFerran, 80 N.M. 622, 459 P.2d 148 (Ct.App.1969). As already stated, no instruction to the jury on the issue was requested by either side.

Defendant next claims misconduct on the part of the district attorney by his remarks concerning the conviction of Miss Halliday, to which reference is above made. Miss Halliday was called as a witness by both the State and defendant, and her testimony as to her conviction was received without objection. Defendant now claims a continuing objection was made to her appearance as a witness. We do not so understand the record. His objection at a pretrial hearing, as we understand it, was simply that the witnesses he claimed he had lost, by reason of the State's delay in arresting him, would testify not only as to the credibility of the undercover agent, but also as to the credibility of Miss Halliday. Even if we were able to distort this into a continuing objection to her testimony at trial, as now claimed by defendant, he must still fail for the reason that we have above ruled against his claim of prejudice by reason of the delay in charging and arresting him.

 The district attorney did make remarks in his closing arguments concerning the testimony of Miss Halliday, and he expressed sorrow over her imprisonment, which he felt was due to her being "vic-

timized" by defendant. However, defendant made no objections to any of these remarks, and in his closing argument referred to her testimony as having been coerced by the State and the district attorney, who held a hammer over her. He cannot now be heard to say he was prejudiced by remarks to which he made no objection. Heald v. United States, 175 F.2d 878 (10th Cir. 1949); State v. Hudson, supra; Grandbouche v. People, 104 Colo. 175, 89 P.2d 577 (1939). The annotation in 48 A.L.R.2d 1016 (1956), and cases cited therein, upon which defendant largely relies, are not in point. As above stated, defendant and Miss Halliday were not convicted of the same offense or of offenses arising out of the same facts or circumstances. Defendant was not convicted because Miss Halliday had also been convicted of selling heroin. The record before us does not disclose the evidence upon which she was convicted, but only that she was convicted for selling heroin. In any event, defendant was convicted upon the evidence adduced as against him.

 The next acts of claimed misconduct are that the district attorney vouched for the credibility of Miss Halliday and the undercover agent, and made inflammatory remarks. Numerous comments by the district attorney are relied upon by the defendant for these claimed errors. None of them, however, amount to a direct vouching by the district attorney for the credibility of either of the said witnesses. Some of the remarks may properly be construed as suggesting confidence by the district attorney in the credibility of the witnesses, and some of them approach the outside limits of permissible argument, if in fact they did not transcend the realm of propriety. Compare Taylor v. United States, 134 U.S. App.D.C. 188, 413 F.2d 1095 (1969). We appreciate a prosecutor is given reasonable lattitude in his closing arguments, and the trial court has wide discretion in controlling the scope of such arguments. State v. Pace, supra. See also United States v. Lewis, 423 F.2d 457 (8th Cir. 1970); State v. Gonzales, 105 Ariz. 434, 466 P.2d 388 (1970); State v. Hanson, 287 Minn. 317, 176 N.W.2d 607 (1970); Conyers v. Wainwright, 309 F.Supp. 1101 (S.D.Fla.1970). However, a prosecutor must exercise good faith and reasonable caution to avoid unfairness. This does not mean, however, that the entire burden is on the prosecutor to make certain his remarks may not possibly be given an improper construction. If a defendant is of the opinion remarks by the prosecutor exceed the bounds of propriety, the burden is on him to make objection and call the objectionable matter to the attention of the trial court. State v. Hudson, supra. Defendant failed to do so here, and, thus, failed to preserve the error, if error was committed. Defendant cannot excuse his failure to object on the ground that to have done so would have magnified the error in the minds of the jury. Nothing said in Greenberg v. United States, 280 F.2d 472 (1st Cir. 1960), or in Handford v. United States, 249 F.2d 295 (5th Cir. 1957), upon which defendant relies for his failure to object, suggests he had no duty to object to preserve the error he now claims, if error there was. Jurors are generally sincerely interested in adhering to the trial court's instructions and admonitions and in accomplishing justice, and they are not nearly so emotional, so given to prejudice, or so incapable of deciding issues fairly, as some attorneys and some courts seem to feel.

Defendant finally claims misconduct on the part of the district attorney in stating a personal belief in defendant's guilt. We disagree with defendant's interpretation of the district attorney's remarks, and we also disagree with his contention that the case of Hall v. United States, 419 F.2d 582 (5th Cir. 1969) is directly in point. It is true the conviction of Hall was reversed because of remarks made by the prosecutors in their arguments, but the remarks there made were far more prejudicial than the remarks made by the district attorney in the present case.

Again, defendant made no objection to the remarks he now claims were so prejudicial to him, and, therefore, preserved no error for review.

It is true the district attorney commented on his duty to prosecute " * * * those people who have violated the laws of the State * * *" and that was why they were all present in court. This may be construed as a belief by the district attorney in defendant's guilt, but the very fact that the district attorney files an information, and then forcefully prosecutes the defendant thereunder, is subject to the same construction. Jurors are informed as to the position occupied by the district attorney, as well as that occupied by defense counsel, and they are instructed as to the presumption of innocence with which the accused is clothed, the burden which the State must bear in securing a conviction, that a verdict of conviction must find support in the facts as found by them from the evidence, and that statements of counsel are not evidence. We are not impressed that jurors disregard these instructions, merely because something said or done by the prosecutor is subject to a construction which may not be in complete accord with the court's instructions. In any event, the error, if any, was not preserved for review. State v. Montoya, supra.

It follows from what has been said that the judgment of conviction should be affirmed.

It is so ordered.

SPIESS, C. J., and HENDLEY, J., concur.