**UNITED STATES of America**

v.

**Harold E. MILLS, Appellant.**

**No. 23020.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 10, 1969.

Decided Jan. 3, 1972.

Rehearing Denied Jan. 13, 1972.

---

292

Mr. Paul M. Craig, Jr., Washington, D. C. (appointed by this Court) for appellant.

Mr. Robert C. Crimmins, Asst. U. S. Atty., and Mr. David P. Smith, Atty., Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Mr. Roger E. Zuckerman, Asst. U. S. Atty., also entered an appearance for appellee.

Before FAHY, Senior Circuit Judge, and ROBINSON and ROBB, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellant was indicted in six counts charging violations of federal narcotic laws allegedly arising from three separate transactions on three different dates.[1] On his motion, four counts based on two of the transactions were dismissed,[2] and two jury trials, each on the two remaining counts, ensued. The first ended in a mistrial;[3] the second, however, in appellant's convictions under 26 U.S.C. § 4704(a) of selling three capsules containing cocaine other than in or from the original stamped package,[4] and under 26 U.S.C. § 4705(a) of selling the capsules not in pursuance of the purchaser's written order.[5] Concurrent sentences, each with a maximum of five years' imprisonment, were imposed,[6] and this appeal followed.

■ Appellant advances four grounds for reversal. He claims that Sections 4704(a) and 4705(a) unconstitutionally required acts of self-incrimination. Since this argument is now foreclosed

by binding judicial precedents,[7] we give it no further attention. Appellant's additional challenges, however, present more difficult problems. One is that the evidence the Government submitted at trial was legally insufficient to sustain a verdict of guilt on either count. Another is that Section 4704(a) unconstitutionally authorized conviction on one count upon factual inferences insufficiently related to the facts proven at the trial. Still another is that a delay, slightly in excess of four months, from the offense date to execution of the warrant for his arrest required dismissal of the two counts on which appellant stood trial. We address these contentions in this opinion[8] and, in the end, affirm each of the convictions.

I

■ The Government's case, contested only in its attribution of the drug transaction to appellant, was presented in its entirety by three witnesses. The principal one was Officer Charles V.

1. The indictment charged that the three transactions occurred on December 19, 20 and 28, 1967, respectively.

2. Those counts apparently were dismissed because of the time lapse between the offense dates and the point at which appellant first received notification of the charges.

3. The record does not inform us of the basis upon which the mistrial was declared.

4. "It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found." 26 U.S.C. § 4704(a) (1964), since repealed, 84 Stat. 1291, 1292 (1970). The repealing legislation contains a provision saving the operation of Section 4704(a), and as well of Section 4705(a) and others cited *infra* notes 22 and 26, as to prosecutions for violations occurring prior to the effective date of the repeal. 84 Stat. 1294 (1970).

5. "It shall be unlawful for any person to sell, barter, exchange, or give away nar-

cotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary [of the Treasury] or his delegate." 26 U.S.C. § 4705 (a) (1964), since repealed, 84 Stat. 1292 (1970). See note 4, *supra*.

6. Approximately five months previously, appellant was sentenced to a maximum of five years' imprisonment on each of three counts of narcotics violations allegedly transpiring ten days after the offenses charged in the case at bar. The other convictions are presently under review by this court *en banc*. No. 22,444, United States v. Mills.

7. We now reject the arguments that Sections 4704(a) and 4705(a) unconstitutionally require acts of self-incrimination, Minor v. United States, 396 U.S. 87, 94–98, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969); Turner v. United States, 396 U.S. 398, 417–418, 90 S.Ct. 642, 24 L. Ed.2d 610 (1970); Burgess v. United States, 142 U.S.App.D.C. 198, 201–203, 440 F.2d 226, 229–231 (1970), after deferring our decision herein to await the action in *Turner* and *Burgess*.

8. In Parts I, II and III, respectively.

Utley, a member of the police force for about three months, who related the details of the sale. About 10:30 p. m. on December 19, 1967, Officer Utley approached the seller, whom he identified as appellant, in a restaurant and unsuccessfully sought to purchase narcotics.[9] The officer then left the restaurant and went to his automobile parked nearby. The seller followed and asked the officer, "Yhat do you want?" Both then got into the car, and there the sale transpired. As described by the officer, appellant said, "I don't have any boy.[10] All I have is girl.[11] And it is three dollars per cap." The officer said, "Give me three," whereupon appellant "pulled from his right pocket three capsules and placed them in [the officer's] right hand."[12] The officer then gave appellant nine dollars and left. The entire transaction required about five minutes, and apparently there were no other witnesses to it.

After the purchase, Officer Utley put the three capsules in a cellophane wrapper, went immediately home and there performed a preliminary field test. Obtaining a positive reaction, he placed the capsules in an envelope on which he marked the date, time and place of the sale together with appellant's name and description. He also made written notes, in which he recorded similar data.

On the next day, Officer Utley turned the envelope over to Sergeant Robert R. Bush, his supervisor. Officer Utley testified that on about seven prior and two subsequent occasions, he saw appellant in the same restaurant and that he knew that appellant was referred to by the nickname "Skip". The transaction testified to was the only one in which Officer Utley engaged on the day in question.

Sergeant Bush took the witness stand to relate the custodial history of the purchased capsules from the point of their delivery to him by Officer Utley until he surrendered them for chemical analysis. John Alan Steele, a forensic chemist specializing in the analysis of narcotics and dangerous drugs, gave uncontradicted testimony that a mixture of cocaine hydrochloride and milk sugar[13] was found in each of the three capsules. Appellant, the sole witness for the defense, testified that he had no record or recollection of his whereabouts or activities on the offense date. Stating that he was regularly employed and admitting that he was frequently a patron of the restaurant, he denied any recognition of Officer Utley. The jury, as we have said, found appellant guilty as charged.

That, in summary, was the evidence. In the trial court, as here, appellant contended that it was legally insufficient to support any verdict of guilty. He tendered the issue in that regard by a motion for a judgment of acquittal on both of the counts upon which he was being tried. The trial judge denied the motion when made initially at the close of the Government's case in chief, and again when renewed after all the evidence was in. We think the judge's rulings were eminently correct.

Appellant's motion summoned the trial judge to "determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justi-

9. In the officer's words, "I approached [appellant]. I said, 'What is happening?' And [he] said, 'hey, man.' and I said, 'Are you in shape?' And [he] said 'No.'"

10. In the vernacular, as the officer explained, "boy" is heroin and "girl" is cocaine.

11. See note 10, *supra*.

12. On cross-examination, the officer emphasized that appellant "took [the capsules] from his right pocket. . . . I know that they came from his right pocket.

. . . I saw him take his hand out of his right pocket." On redirect examination, the officer was asked, "did you actually see him take these items out?" He responded in the affirmative and explained that "[t]he items were taken out in loose form. . . . In other words, they were loose in his hand. They weren't in any type of container, they were just loose."

13. The milk sugar, said Dr. Steele, "is a dilutive agent. It is filler substance."

fiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."[14] In discharging this responsibility, the judge was required to "assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom."[15] Implicit in the judge's rulings was the view "that prudent jurors might have no such doubt, or might disagree as to its existence."[16] We find no cause for overturning that conclusion, and accordingly hold that the denial of appellant's motion must stand.[17]

The first prong of appellant's attack on the evidence is the claim that it did not show that the capsules were sold in violation of Section 4704(a). That section makes a sale of narcotics a crime only if not made "in" or "from" the original stamped package,[18] and proof of that element is essential to conviction.[19] Officer Utley testified that the capsules, when handed to him, were not in a container;[20] they were loose, he said, and there was no stamp of any kind on them. If accepted, that testimony established that the three capsules were not sold "in the original stamped package."

Appellant argues, however, that since the officer could testify only that the seller took the capsules from his pocket, and since the officer admittedly did not know whether anything else was in the pocket, the proof failed to show that the sale was not "from the original stamped package." But Officer Utley's testimony shows clearly that the capsules were produced from the seller's pocket by the use of his right hand only.[21] We find nothing in the testimony indicative of the manipulations required to effect a one-handed removal of three capsules from some sort of a container.[22] Particularly in light of "the totality of the negotiations"[23] bespeaking an illicit deal for narcotics, the jury could reasonably

---

14. Curley v. United States, 81 U.S.App. D.C. 389, 392, 160 F.2d 229, 232, cert. denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

15. *Id.*

16. Bailey v. United States, 135 U.S.App. D.C. 95, 97–98, 416 F.2d 1110, 1112–1113 (1969).

17. See *id.*; Curley v. United States, *supra* note 14, 81 U.S.App.D.C. at 392–393, 160 F.2d at 232–233, and authorities there cited.

18. See note 4, *supra*.

19. *E. g.,* United States v. Bailey, 277 F.2d 560, 562–564 (7th Cir. 1960).

20. See note 12, *supra*.

21. See note 12, *supra*.

22. Section 4704(a) was a part of repealed legislation, 84 Stat. 1292 (1970), see note 4, *supra*, which imposed a federal tax on narcotic drugs. See 26 U.S.C. § 4701 (1964) *et seq.* Payment of the tax was evinced by stamps. 26 U.S.C. § 4771(a) (1964). By statute, the stamps were required to be "so affixed to the bottle or other container as to securely seal the stopper, covering, or wrapper thereof." 26 U.S.C. § 4703 (1964). An implementing regulation provided that "[o]ne or more stamps of an appropriate size shall be so affixed as to securely seal the package," and that "[i]n the case of bottles, cans, or other containers with stoppers, lids, or other removable closing devices, the stamp or stamps shall seal the stopper, lid, or other closing device at two opposite points." 26 C.F.R. § 151.128 (1967). Assuming even that capsules intermixing cocaine and milk sugar move in legal channels, note 13, *supra*, the jury could properly infer that the withdrawal of three capsules from a sealed container with one hand was a feat hardly possible without some outward manifestation of the activity its accomplishment would make necessary. And while the seller's possession of the capsules in a previously opened original stamped package was conceivable, the jury was not obligated to accept that bare possibility as fact or to conclude that extraction of the three capsules from even such a container could completely escape outside notice.

23. Henley v. United States, 406 F.2d 705, 706 (5th Cir. 1969). They indicated compellingly a furtive, illegal transaction in the making, see *id.*, a circumstance bolstered by the blend of cocaine and milk sugar in the capsules. See note 13, *supra*.

infer that the capsules in the seller's pocket were unpackaged.[24]

■ We conclude similarly on appellant's other objections to the legal sufficiency of the Government's evidence. Those conclusions may be briefly summarized. We find no defect in the proof of the sale as one not "in pursuance of a written order of" the purchaser, an indispensable element of the offense specified in Section 4705(a);[25] Officer Utley testified flatly that there was no such order. The chain of custody of the three capsules was shown with enough precision to exclude any reasonable possibility that the capsules analyzed were not the capsules purchased.[26] It is beyond question that the capsules contained "narcotic drugs" within the meaning of the statutes upon which the prosecution was laid.[27] Notwithstanding that the officer was the Government's only witness to the transactions and the seller's identity, his testimony, if believed by the jury, sufficed to forge in all other essential aspects the Govern-

ment's case on both counts.[28] Lastly, our past decisions have firmly established the rule that a narcotics conviction may appropriately rest alone upon the uncorroborated testimony of an undercover agent.[29] We hold, then, that the evidence, tested by the governing legal principles,[30] warranted submission of the case to the jury on each of the two counts.

## II

■ Section 4704(a) provided that "the absence of appropriate taxpaid stamps from narcotic drugs shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found."[31] The trial judge explained to the jury every essential element of the offense specified by that section, emphasized the Government's bruden of proof beyond a reasonable doubt on each, but also rendered instructions harmonious with the inference the section authorized.[32] Appellant

24. We refer to an ordinary evidentiary inference authorized by the facts supported by direct proof, and not to the statutory inference specified in Section 4704(a). See Part II, *infra*.

25. See note 5, *supra*.

26. See United States v. Robinson, 145 U.S. App.D.C. 46, 51–52, 447 F.2d 1215, 1220–1221 (*en banc* 1971); Gass v. United States, 135 U.S.App.D.C. 11, 13–16, 416 F.2d 767, 769–772 (1969).

27. See notes 4–5, *supra*. For purposes of Sections 4704(a) and 4705(a), the words "narcotic drugs" include "[a]ny compound, manufacture, salt, derivative, or preparation of . . . coca leaves." 26 U.S.C. § 4731(a) (2) (1964), since repealed, 84 Stat. 1292 (1970). See note 4, *supra*. The Government's chemist testified without contradiction that "cocaine hydrochloride is a high hydrochloride of [*sic*] salt or cocaine alkaloid. [It] is a derivative of the cocoa [*sic*] leaf, a narcotic drug." That conclusion is buttressed by the exception from the statutory definition of "decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonime." 26 U.S.C. § 4731(a) (3) (1964). Even without this testimony, we might take judicial notice, see United States

v. Marizal, 421 F.2d 836, 837 (5th Cir. 1970); Jordan v. United States, 345 F.2d 302, 304 (10th Cir. 1965), that cocaine, as a derivative of coca leaves, is embraced within that definition, a fact judicial authority amply confirms. *E. g.*, Turner v. United States, *supra* note 7, 396 U.S. at 402 n. 2, 90 S.Ct. 642; Padilla v. United States, 278 F.2d 188, 190 (5th Cir. 1960); United States v. Pisano, 193 F.2d 355, 359, 31 A.L.R.2d 409 (7th Cir. 1951).

28. The considerations appellant urges go to the weight of the Government's evidence. They were, of course, for the jury.

29. Brooke v. United States, 128 U.S.App. D.C. 19, 27, 385 F.2d 279, 287 (1967); Bush v. United States, 126 U.S.App.D.C. 174, 375 F.2d 602 (1967); Morrison v. United States, 124 U.S.App.D.C. 330, 332, 365 F.2d 521, 523 (1966); Wilson v. United States, 118 U.S.App.D.C. 319, 320, 335 F.2d 982, 983 (1963).

30. See text *supra* at notes 14–16.

31. See note 4, *supra*.

32. The instructions in the latter regard were:
    The law imposes a tax upon all narcotic drugs. It provides that the United States Internal Revenue stamp is

attacks the statutory inference on the ground, *inter alia*, that its relationship to the facts it required to be proved is too tenuous to satisfy the demands of due process.[33]

In Turner v. United States,[34] decided after trial of the case at bar, the Supreme Court held that the Section 4704(a) inference, though valid as to the possession of heroin, was constitutionally infirm as to the possession of cocaine.[35] With *Turner* establishing that it was error to instruct on the inference,[36] we turn now to consider its effect upon appellant's Section 4704(a) conviction.

The instant case is unlike the many others in which a finding of guilt under Section 4704(a) could rest only upon the statutory inference from the possession of unstamped narcotic drugs. For here Officer Utley, the Government's main witness, testified elaborately, not simply to appellant's possession of the three capsules containing cocaine, but to an actual sale of the capsules by appellant. The jury's verdict of guilty on the Section 4704(a) charge, then, was amply supported by that testimony without reference to the statutory inference;[37] and manifestly the verdict is good if it was uninfluenced by the court's instructions on the inference. But if, on the other hand, the jury relied to any extent on the inference, or if there is uncertainty as to whether it did so, it is equally manifest that the verdict cannot stand.[38] The question, then, is whether

---

evident in payment of the tax and it shall be so affixed to the bottle or container as to securely seal the stopper, or covering, or wrapper, over the container.

If you, as jurors, have a reasonable doubt whether or not the narcotics were purchased or sold or dispensed or distributed in a package bearing the original revenue-stamped package, or from a package bearing the original revenue stamp, then you must find the defendant not guilty.

It is provided by the law that the absence of appropriate tax-paid stamps from narcotic drugs shall be prima facie evidence of a violation of a person in whose possession the same may be found.

This means, if the government has proved beyond a reasonable doubt by direct evidence that the defendant had possession of the narcotic drugs specified in the indictment and that the revenue stamps were absent from the narcotic drug while in the defendant's possession, you may, if you see fit to do so, infer from these facts alone that the defendant is guilty of this offense.

You are not required to find the defendant guilty merely upon proof of these facts, but you may do so if you deem it appropriate.

It is exclusively within your province to determine whether the government has proven beyond a reasonable doubt by direct evidence that the defendant had possession of a narcotic drug. And if so, whether the government has further proved beyond a reasonable doubt

by direct evidence the absence of revenue stamps from the narcotic drug while in the defendant's possession, and if so, whether you will, from these circumstances, infer that the defendant is guilty of the offense charged.

33. See, *e. g.*, United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965).

34. *Supra* note 7.

35. 396 U.S. at 419–424, 90 S.Ct. 642. We have recognized that *Turner* operates retrospectively, *e. g.*, Burgess v. United States, *supra* note 7, 142 U.S.App.D.C. at 201–202, 440 F.2d at 229–230, as have other circuits. *E. g.*, United States v. Cross, 432 F.2d 431, 433 (4th Cir. 1970); United States v. Fueston, 426 F.2d 785, 787 (9th Cir. 1970).

36. "It is important to understand that the Court in the *Turner* decision did not invalidate the criminal provisions contained in § 4704(a). Only the evidentiary presumption contained in 4704(a) as applied to cocaine was found unconstitutional, . . . ." United States v. Ferra, 427 F.2d 1348, 1351 (5th Cir. 1970).

37. "The [Section 4704(a)] presumption has practical value only where the evidence shows that the defendant merely possessed narcotics." *Id.*

38. Compare Turner v. United States, *supra* note 7, 396 U.S. at 407, 90 S.Ct. 642.

we can say that beyond a reasonable doubt the jury did not base its Section 4704(a) verdict in whole or in part on the statutory inference.[39]

Our scrutiny of the record convinces us that that question must be answered in the affirmative. The evidence that appellant possessed the capsules came from the lips of Officer Utley. That evidence consisted only of the officer's testimony that appellant pulled the capsules from his pocket and passed them over to him.[40] Thus the only testimony reflecting the seller's possession of the capsules was the very testimony establishing the sale of the capsules. In other words, the only possession appellant was shown to have had of the capsules was that immediately prior to the sale —a sale demonstrated, not by inference, but by Officer Utley's direct testimony based on actual observation. We think it clear, then, that the jury could not possibly have found that appellant possessed the capsules without also finding that appellant sold them. And the jury's finding that there was a sale, if indeed not apparent from the verdict on the Section 4704(a) count, is clear from the verdict on the count laid under Section 4705(a), as to which the jury could not have been aided by a statutory inference.[41]

We realize, of course, that "[c]onstitutional errors in presumption instructions, . . . may require somewhat closer scrutiny than errors in the admission of evidence, since they affect not merely one element in the proof of guilt, but the manner in which the jury evaluates all the remaining elements." [42] For that reason, we have scrutinized the record for any sign that the instructions on the Section 4704(a) inference exerted any such influence, but we perceive none. Officer Utley's testimony bearing on the essential elements of the Section 4704(a) offense was integral—hardly susceptible to partial acceptance and partial rejection on any rational pick-and-choose basis.[43] It was, too, predicated on direct observations in every respect save only the fact that the capsules were sold not from the original stamped package.[44] In that aspect of the case the instructions on the inference could not have swayed the jury in the least, for the trial judge charged explicitly that the statutory inference could not be drawn or utilized at all unless a sale not from the original stamped package was first proven beyond a reasonable doubt.[45] It is thus evident that the jury, in finding the sale of the capsules not from the original stamped package, could not have been assisted by the statutory inference.

We conclude, then, that the jury's determination of appellant's guilt under Section 4704(a) could not have been influenced by the instructions on the Section 4704(a) inference, and that, in consequence, the rendition of those instructions was harmless error.[46]

### III

In Robinson v. United States,[47] argued conjunctively with the instant

---

39. E. g., Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 2d 284 (1969).

40. See note 12, supra, and accompanying text.

41. Unlike Section 4704(a), Section 4705 (a) contains no provision authorizing an inference of guilt or of facts from proven facts, and the trial judge's instructions remained faithful to that consideration.

42. United States v. Fueston, supra note 35, 426 F.2d at 787. See also United States v. Bollenbach, 326 U.S. 607, 614–615, 66 S.Ct. 402, 90 L.Ed. 350 (1946).

43. Compare Brooke v. United States, supra note 29, 128 U.S.App.D.C. at 22–24, 385 F.2d at 282–284.

44. See text supra at notes 20–24.

45. See note 32, supra.

46. Compare Turner v. United States, supra note 7, 396 U.S. at 420–421, 90 S.Ct. 642; United States v. Ferra, supra note 36, 427 F.2d at 1351. But see United States v. Fueston, supra note 35, 426 F.2d at 787.

47. 148 U.S.App.D.C. 58, 459 F.2d 847 (1972).

case and just decided today, we reviewed in some detail the problem of delay incidental to the inauguration of narcotics prosecutions. The framework for analysis is presented there; [48] it remains only for us to apply that analysis to the facts of this case.

The alleged offense took place on December 19, 1967, at 10:30 p. m. The complaint was sworn out on March 29, 1968, when the undercover policeman finished the first of two tours of duty. This period of delay would not normally call for a detailed investigation into its reasonableness, but where we have some unusual facts. Although on the date the complaint was made appellant was in custody on another charge [49]—and had been since December 29, 1967—the arrest warrant was not served on him until April 22, 1968. Thus for some 24 days the police delayed information to appellant that he was being accused of further criminal activity.

On these facts, appellant, invoking Ross v. United States,[50] argues that the total delay of some four months was unreasonable. He contends, first, that he should have been told about the new charges as soon as he was arrested ten days after the alleged offense. He reasons that no jeopardy of the agent's cover could have resulted from such early notice since from then on he remained in custody. Standing alone, this argument fails to recognize that incarceration does not of itself close all channels of communication with the outside world. Opportunities to pass the word back to the street are real, and if seized upon the officer's cover could have been fatally compromised.

Appellant counters this argument by pointing out that the undercover police officer surfaced on March 29, at which time he swore out the complaint against appellant, and then returned underground for another tour which did not end until July. The very premise upon which *Ross* rested is that ordinarily the police cannot unmask an undercover agent shortly after a purchase is consummated.[51] The Government's demonstrated ability to do just that in this case thus conflicts with its orthodox position in *Ross*-type cases. Yet it is quite possible either that atypical circumstances not disclosed to us, or that an unusual disregard of the danger the officer might face, prompted the course of action in this case. In any event, decisions on the handling of undercover agents in this manner, no less than in others, reside well within the discretion normally accorded law enforcement officers. It may be that on a showing that without losing their effectiveness and without risking substantial danger, undercover policemen could sally forth to swear out complaints and then return to the field, the whole structure of the *Ross* decision, which assumes that undercover men cannot be used in this way, would have to be reexamined. But that sort of demonstration has not been made here, and we cannot say that it was unreasonable for the police to fail to inform appellant of the charges against him before the formal complaint was filed.

Nevertheless, the facts here do indicate a degree of unreasonable delay. We assume, in the absence of a contrary showing, that the initial three-month delay between the alleged offense and the lodging of the complaint was essential to the efficiency and safety of the undercover operation. There was, however, an additional, unexplained delay of 24 additional days before appellant learned, by execution of the arrest warrant, of the charges the complaint preferred against him. Justification for that delay is not apparent since appellant was in custody, and so was available at all times for service. The result, then, is that the

---

48. *Id.,* —— U.S.App.D.C. at 61–64, 459 F.2d 850–853.

49. See note 6, *supra.*

50. 121 U.S.App.D.C. 233, 349 F.2d 210 (1965).

51. See *id.* at 236, 349 F.2d at 213.

three-month delay, which might easily have passed the test of reasonableness if notice had promptly followed the complaint, was aggravated by the 24-day delay that seems in at least some wise to have been unnecessary.

In Godfrey v. United States,[52] we faced a cognate problem. Upon completion of a tour of duty, an undercover police officer filed a complaint naming the accused as a three-time seller of narcotics slightly less than two months before. A warrant for the accused's arrest was not executed, however, until nine weeks later. While the delay between the offenses and the complaint was explained by the exigencies of the then-continuing undercover operation,[53] the District Judge, after an evidentiary hearing for which we had previously remanded the case, found that the police had failed to use diligence to arrest the accused after the complaint, and that the combination of the two delays—a total of four months—prejudiced the accused's ability to defend himself with respect to the charges relating to two of the three transactions.[54] On that evidence, we sustained the judge's finding that the nine-week delay was unreasonable and, on the law, his conclusion that the charges based on the two transactions should be dismissed.[55]

What we said in *Godfrey* is as important to this case as what we actually

held. "These determinations, in our view," we declared, "fell within the discretion committed to the judge as the trier of the facts on the remand and as the presiding authority at the trial on the merits."[56] We observed "that, although the total lapse of time from offense to arrest was about four months, two months of that period was not protected, in terms of reasonableness, by any purpose to advance the public interest in effective law enforcement."[57] We shared the District Judge's view "that, where delay to serve the purposes of the public occurs, with inevitable impact upon the interests of the accused, there is an obligation on the police to be as diligent as possible in making the arrests, to the end that the accused may know as soon as possible of the charge against him."[58] We concluded that "[t]he disadvantage to the accused inherent in the deliberate preference accorded the public interest in the one period should not be compounded by a failure to exercise appropriate diligence in the other."[59]

We think, then, that the 24-day delay following the undercover officer's emergence and presentation of charges against appellant must weigh against the Government. On the record before us, it stands unjustified and, while we do not say that so long a delay in executing the warrant is impossible to explain,[60] it is difficult under the known

---

52. 123 U.S.App.D.C. 219, 358 F.2d 850 (1966).

53. *Id.* at 221, 358 F.2d at 852.

54. The accused had denied participation in the sales, and had testified that he was in New York on one of the occasions and could not remember his activities on the other two.

55. The District Judge also awarded, and we approved, a new trial on the counts relating to the other transactions because the accused's inability to testimonially account for two of the transaction dates might have affected the verdict on the third.

56. 123 U.S.App.D.C. at 221, 358 F.2d at 852.

57. *Id.*

58. *Id.*

59. *Id.*

60. We are cognizant of the possibility that even under ideal conditions execution of the warrant on appellant could have required a period of some days. Consequently, as we view the matter, the most that could be unjustified is something less than the full 24 days. We are not informed, however, as to how long execution would have taken in the normal course of events, nor are we supplied any information whatsoever as to why it took so long in this case.

circumstances to conceive how it could. But unreasonableness of the delay, if the fact, would not end the matter; it would simply chalk up one mark against the Government. The second touchstone of *Ross*—prejudice resulting from the delay—demands further analysis of the situation here.

Appellant contends that the delay prejudiced his defense because he could not remember where he was during the time the narcotics transaction took place. He took the witness stand at the trial to deny participation in the sale, but offered no alibi. Appellant was employed at the time of the offense, a fact which slightly distinguishes his case from *Ross*,[61] but that hardly means that he failed to come forward with "a plausible claim" of prejudice.[62] It seems not illogical to suppose that many people would be unable to account for a given five-minute period at 10:30 on an evening some four months before.

There is, too, the central concern of the *Ross* ruling—"the lurking danger of misidentification"[63] in narcotics prosecution. That is a hazard bearing close relationship with the strengths and weaknesses of the Government's case. Our decisions have accordingly recognized that an appraisal of prejudice stemming from unwarranted delay in getting such prosecutions under way

must take account of the reliability of the procedures by which the accused was identified as the culprit and the caliber of the Government's proof on that score.[64] As we look to the facts of record here, we find that they incline in both directions.

Officer Utley, the undercover agent, was the Government's only witness to the drug transaction in question. By his own testimony, the lighting was dim in the restaurant where the purchase was first broached and in the automobile where it was later consummated. The sale encounter was brief; by the officer's testimony, it consumed only about five minutes. There are, however, other circumstances of quite different import. Officer Utley made notes of the transaction, and reviewed them prior to his tenure on the witness stand. He also recorded on the envelope in which he delivered the purchased capsules appellant's name and data describing generally his physical features and attire. This description, as far as it goes, fits appellant.[65] Very importantly, the officer had seen appellant at the same restaurant seven times before the sale and twice thereafter, and knew him by the nickname "Skip." The drug transaction attributed to appellant stood out as the only one in which the officer engaged in the day in question. Appellant admitted

61. See 121 U.S.App.D.C. at 236, 349 F.2d at 213. See also Morrison v. United States, *supra* note 29, 124 U.S.App.D.C. at 332, 365 F.2d at 523.

62. See Jackson v. United States, 122 U.S. App.D.C. 124, 126, 351 F.2d 821, 823 (1965).

63. Robinson v. United States, *supra* note 47, 148 U.S.App.D.C. at 64, 459 F.2d at 853.

64. *Id.*

65. We are mindful that the description Officer Utley wrote on the envelope omits some characteristics peculiar to appellant.

He has a half-inch mark under his left eye, a scar on the side of his neck and a gold tooth in the left side of his mouth, and none of these is mentioned in that particular description. But aside from possible question as to normal visibility of at least some of these marks, there appears of record no inquiry of the officer as to reasons for the omissions, or as to what the officer's notes might reflect in that regard, or even as to whether the officer had any unrecorded knowledge or recollection of the distinguishing marks. In such circumstances, we do not think the omissions necessarily indicated that the officer, after having seen the seller on ten occasions, could not identify him at the trial.

that he frequented the restaurant, and that he was there around the date of the sale.

In sum, what we view is a situation in which the 24-day delay appears unreasonable to some extent, the claim of resulting prejudice sounds not improbable, and the Government's identification techniques and proof, while not the weakest, shape up as something less than the sturdiest. Only today we point out that "[o]ur decisions lay down no rules as to the weight to be assigned to these factors; they call, instead, for judicial judgment of the most delicate type;"[66] and where, as here, that judgment has in the first instance been exercised by the trial judge, we think it clear that it must be accorded due deference.[67] In the case at bar, the judge twice denied appellant's motion to dismiss for unseemly delay the counts upon which the jury eventually found him guilty. The first denial followed a pretrial evidentiary hearing, and the second came at the close of the trial. There can be no doubt, then, as to the judge's vantage point to weigh the relevant evidence, and particularly to make essential assessments of witness' credibility on the matters critical to the inquiry.[68] And while rulings within areas wherein trial judges have traditionally been indulged broad discretion are not necessarily impregnable, we do not discern here, any more than we could in *Godfrey*[69] any sound reason for disturbing the determination already made.

The judgment of appellant's conviction is

Affirmed.

**66.** Robinson v. United States, *supra* note 47, 148 U.S.App.D.C. at 64, 459 F.2d at 853.

**67.** See Godfrey v. United States, *supra* note 52, 123 U.S.App.D.C. at 221, 358 F.2d at 852.

**68.** Prominent among the required credibility judgments were Officer Utley's uncorroborated identification of appellant as the seller, and appellant's equally uncorroborated claim that he did not remember his whereabouts when the sale transpired.

**69.** *Supra* note 52.